UNITED STATES, Appellee

v.

Mr. Alaa Mohammad ALI, Appellant

No. 12-0008/AR

Crim. App. No. 20080559

United States Court of Appeals for the Armed Forces

Argued April 5, 2012

Decided July 18, 2012

ERDMANN, J., delivered the opinion of the court, in which STUCKY and RYAN, JJ., joined. BAKER, C.J., and EFFRON, S.J., each filed a separate opinion concurring in part and in the result.

Counsel

For Appellant: Lieutenant Colonel Peter Kageleiry Jr. (argued); Colonel Patricia A. Ham, Lieutenant Colonel Imogene M. Jamison, and Major Jacob D. Bashore (on brief).

For Appellee: Captain Chad M. Fisher (argued); Colonel Michael E. Mulligan, Major Amber J. Roach, and Captain John D. Riesenberg (on brief).

Amici Curiae for Appellant: John F. O'Connor, Esq., Michael J. Navarre, Esq., and Dwight H. Sullivan, Esq. (on brief) -- for the Air Force Appellate Defense Division. Captain Paul C. LeBlanc, JAGC, USN (on brief) -- for the Navy-Marine Corps Appellate Defense Division.

Amicus Curiae for Appellee: Jeffery C. Barnum (law student) (argued); Eric Schnapper, Esq. (supervising attorney) (on brief) -- for the University of Washington School of Law.

Military Judge: Timothy Grammel

**This opinion is subject to revision before final publication.**

United States v. Ali, No. 12-0008/AR

Judge ERDMANN delivered the opinion of the court.

Pursuant to his pleas, Mr. Alaa Mohammad Ali, a foreign national working as a civilian contractor in Iraq, was convicted by a military judge sitting as a general court-martial of making a false official statement, wrongful appropriation, and wrongfully endeavoring to impede an investigation, in violation of Articles 107, 121, and 134 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 921, 934 (2006). Ali was sentenced to five months of confinement. In accordance with a pretrial agreement, the convening authority approved a sentence of time served. The United States Army Court of Criminal Appeals (CCA) affirmed the findings and only so much of the sentence as included 115 days of confinement and ordered that Ali be credited with 115 days of confinement credit to be applied against his sentence. United States v. Ali, 70 M.J. 514, 521 (A. Ct. Crim. App. 2011).[1]

Prior to trial Ali filed a motion to dismiss, arguing that under the facts of this case Congress could not exercise military jurisdiction over him, but if the exercise was proper, the court-martial lacked jurisdiction under Article 2(a)(10), UCMJ. The military judge denied the motion holding that the

---

[1] Oral argument was held at the University of Washington School of Law, Seattle, Washington, as part of the court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n. 1 (C.A.A.F. 2003). This practice was developed as part of a

congressional exercise of jurisdiction was constitutional and the court-martial had jurisdiction pursuant to Article 2(a)(10), UCMJ.[2]  After Ali's conviction, his case was forwarded to the Army Judge Advocate General (JAG) for review under Article 69(a), UCMJ.  The Army JAG subsequently forwarded Ali's case to the CCA for review of the jurisdictional issues.  Direction for Review, United States v. Ali, No. 20080559 (A. Ct. Crim. App. filed Mar. 31, 2010).  The CCA affirmed the military judge's jurisdictional determinations.  Ali, 70 M.J. at 520.

We granted review to determine whether Ali falls within the scope of Article 2(a)(10) and, if so, whether this exercise of jurisdiction violates the Constitution.[3]  We hold that Ali falls

---

public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

[2] Following the denial of his motion to dismiss, Ali filed a petition for extraordinary relief with the CCA, which the CCA denied.  Ali v. Austin, Army Misc. Dkt. No. 20080678 (A. Ct. Crim. App. 2008).  Ali then filed a writ-appeal petition with this court which was also denied.  Ali v. Austin, 67 M.J. 186 (C.A.A.F. 2008) (summary disposition).

[3] We granted review of the following issues:

> I.   Whether the military judge erred in ruling that the court had jurisdiction to try Appellant and thereby violated the due process clause of the Fifth and Sixth Amendments by refusing to dismiss the charges and specifications.
>
> II.  Whether the court-martial had jurisdiction over Appellant pursuant to Article 2(a)(10), Uniform Code of Military Justice.
>
> III. Whether an Article 134 clause 1 or 2 specification that fails to expressly allege either potential terminal element states an

within the scope of Article 2(a)(10) and that the congressional exercise of jurisdiction, as applied to Ali, a non-United States citizen Iraqi national, subject to court-martial outside the United States during a contingency operation, does not violate the Constitution.

Background

I.   Events Leading to the Charges Against Ali

Mr. Ali was born in Baghdad and is an Iraqi citizen.  Ali fled Iraq in 1991 and ultimately settled in Canada where he obtained Canadian citizenship in 1996.  Under both Canadian and Iraqi law, Ali retained his Iraqi citizenship.  In December 2007, Ali entered into an independent contractor agreement with L3 Communications, an American company, to provide linguist services in Iraq under L3's contract with the United States Army Intelligence and Security Command.[4]  The contract stated that the work may take place in a combat zone or other dangerous

---

offense under the Supreme Court's holdings in United States v. Resendiz-Ponce and Russell v. United States, and this Court's Opinion in United States v. Fosler, 70 M.J. 225 (C.A.A.F. 2011).

United States v. Ali, 70 M.J. 418 (C.A.A.F. 2011) (order granting review).

[4] Ali's employment contract was with L3 Communications (L3), however, in his Army Letter of Identification and Authorizations, the organization is identified as "Titan Corporation."  Ali's employer is referred to as "L3," "Titan," "L3 Titan," and "L3/Titan Corporation" in the record.  All references in this opinion are to L3.

environment but did not contain a provision notifying Ali that he was subject to the UCMJ.

After receiving predeployment training at Fort Benning, Georgia, Ali was assigned to serve as the interpreter for 1st Squad, 3rd Platoon, 170th Military Police Company, stationed in Hit, Iraq. 1st Squad was tasked with training and advising the Iraqi police in Hit. As an interpreter, Ali accompanied 1st Squad on its missions and served as the direct link between the squad and the Iraqi police officers. Ali wore the same clothing as the soldiers but was not issued a weapon. Initially Ali lived with the soldiers of 1st Squad but when the squad was moved to a different location, he lived with other interpreters serving with the 3rd Platoon. For administrative purposes Ali was supervised by the L3 Site Manager in Al Asad, Iraq, but for operational purposes he reported directly to Staff Sergeant Butler, squad leader for 1st Squad.

On February 23, 2008, Ali had a verbal altercation with another Iraqi interpreter, Mr. Al-Umarryi. During this altercation Al-Umarryi struck Ali in the back of the head with his fist. The incident was reported to Butler and while Ali was alone in Butler's room waiting for the squad leader to return, he took a knife off Butler's weapons belt without Butler's permission or knowledge. Ali later had another confrontation

with Al-Umarryi which resulted in four cuts to Al-Umarryi's chest and a bloody nose for Ali.

On February 23, Ali was placed on restricted liberty which prohibited him from leaving Victory Base Complex and required that he check in with L3 twice a day.  L3 was aware of this restriction.  Ali violated the restriction and traveled to Al Asad.  He was then placed in pretrial confinement on February 29.  On March 27, charges were preferred against Ali and on April 9, 2008, his employment was terminated by L3.  On May 10, the charges were referred to a general court-martial and on May 24, 2008, Ali's counsel filed a motion to dismiss for lack of jurisdiction.

II.  Ruling of the Military Judge

In his ruling on Ali's motion to dismiss, the military judge found that jurisdiction existed over Ali under Article 2(a)(10), which provides for UCMJ jurisdiction "[i]n time of declared war or contingency operation, [over] persons serving with or accompanying an armed force in the field."[5]

In finding jurisdiction, the military judge held: Operation Iraqi Freedom (OIF) was a contingency operation as defined by Congress in 10 U.S.C. § 101(a)(13) (2006); Ali was a "person" as that term is used in the statute; Ali was "serving with or accompanying an armed force" because he "served as an

6

interpreter on every mission the squad went on" and was an "integral" and "necessary part of the team;" and, Ali was serving "in the field" for purposes of Article 2(a)(10), because the area of Hit was an area of "actual fighting."

In finding jurisdiction over Ali, the military judge focused on Ali's status at the time of trial and again held that he was a person accompanying an armed force in the field during a contingency operation. Citing Perlstein v. United States, 151 F.2d 167, 169-70 (3d Cir. 1945), the military judge rejected Ali's argument that there was no jurisdiction because L3 had terminated his employment prior to the referral of charges holding that "[Ali's] relationship with his civilian employer is not determinative."[6]

The military judge also rejected Ali's argument that the Government could not exercise jurisdiction because he was not on notice that he was subject to the UCMJ. The military judge held that while there was no requirement that Ali be notified that he

---

[5] Article 2, UCMJ, enumerates individuals who are subject to court-martial under the UCMJ.

[6] In Perlstein, the United States Court of Appeals for the Third Circuit affirmed the lower court's finding that the court-martial had jurisdiction over the accused, a civilian contractor working for the Army in Africa who was alleged to have stolen jewelry after being terminated but before departing Africa. The court explained that "it is not Perlstein's employment status. . . that furnishes the test of the court martial's [sic] jurisdiction over him." 151 F.2d at 169.

was subject to the UCMJ, Ali had, in any event, been notified that he was subject to the UCMJ.[7]

After finding jurisdiction over Ali under the terms of Article 2(a)(10), UCMJ, the military judge went on to review "whether Congress has the power, under the United States Constitution, to extend military jurisdiction as far as it did to reach the accused." The military judge held that the exercise of court-martial jurisdiction over Ali, "under the facts of this case," was constitutional pursuant to art. 1, § 8, cl. 14 of the United States Constitution (granting Congress the authority "to make Rules for the Government and Regulation of the land and naval Forces"). Addressing Ali's argument that he was denied his Fifth Amendment right to presentment or indictment of a grand jury, the military judge explained "[b]ecause this is a case arising in the land or naval forces, the Fifth Amendment explicitly states that the accused has no such right at this court-martial."

---

[7] The military judge found that Ali attended a predeployment briefing at Fort Benning where he was notified that he would be subject to the UCMJ. While Ali disputes this finding of fact, we accept the military judge's factual finding on this point as it is supported by record testimony indicating that Ali signed in at the briefing immediately following. See United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F. 2000) ("When an accused contests personal jurisdiction on appeal, we review that question of law de novo, accepting the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record.").

III.  Ruling of the Army Court of Criminal Appeals

Following Ali's conviction, the Army JAG sent Ali's case to the CCA for review under Article 69, UCMJ.  Before the CCA Ali argued that "Congress exceeded the scope of its legislative authority when it amended the UCMJ to extend court-martial jurisdiction to reach civilians during contingency operations and thereby deprived him of the due process protections of the Fifth and Sixth Amendments to the United States Constitution." Ali, 70 M.J. at 517.

The CCA first evaluated the statutory application of Article 2(a)(10) and agreed with the military judge that "appellant and his offenses fall squarely within the jurisdictional language of Article 2(a)(10)."  Id. at 518.

In its constitutional analysis, the CCA found that Article 2(a)(10) was appropriately limited by the requirements that there must be a declared war or contingency operation and that the person must be serving with or accompanying the force in the field.  Id. at 520.

> These two requirements, when applied in conjunction
> with the temporal requirement that either a declared
> state of war or a contingency operation be in
> existence, ensure that the exercise of jurisdiction
> over civilians is "restricted" to the "narrowest
> jurisdiction deemed absolutely essential to
> maintaining discipline among troops in active
> service."

Id. (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 240 (1960)).  Finding that the exercise of military

jurisdiction over Ali was proper, the CCA found no violation of either the Fifth or Sixth Amendments.  Id.

## Discussion

In his appeal to this court, Ali renews his arguments that: (1) the exercise of UCMJ jurisdiction over him violated his Fifth and Sixth Amendment rights; and (2) he does not fall within the scope of the provisions of Article 2(a)(10).  We will address these issues in reverse order as it is unnecessary to review the constitutional questions if Ali does not fall within the statutory scope of Article 2(a)(10).  See Crowell v. Benson, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

I.  UCMJ Jurisdiction

"Jurisdiction is the power of a court to try and determine a case and to render a valid judgment.  Jurisdiction 'is a legal question which we review de novo.'"  United States v. Harmon, 63 M.J. 98, 101 (C.A.A.F. 2006); United States v. Kuemmerle, 67 M.J. 141, 143 (C.A.A.F. 2009).  Generally, there are three prerequisites that must be met for courts-martial jurisdiction to vest:  (1) jurisdiction over the offense, (2) jurisdiction

over the accused, and (3) a properly convened and composed court-martial.  See Rule for Courts-Martial (R.C.M.) 201(b); Harmon, 63 M.J. at 101.  Only the first two of these requirements are at issue in this case.

    A.  Jurisdiction Over the Offense

    "[G]eneral courts-martial have jurisdiction to try persons subject to this chapter for any offense made punishable by [the UCMJ]."  Article 18, UCMJ, 10 U.S.C. § 818 (2006); R.C.M. 201(b)(5) ("The offense must be subject to court-martial jurisdiction.").  Additionally, the UCMJ "applies in all places."  Article 5, UCMJ, 10 U.S.C. § 805 (2006).  Because Ali was charged with and convicted of misconduct punishable by Articles 107, 121, and 134 of the UCMJ, the court-martial had jurisdiction over the offenses.

    The court-martial's jurisdiction over the offense alone, however, is not sufficient to establish jurisdiction.  Since 1987 it has been clear that an inquiry into court-martial jurisdiction focuses on the person's status, i.e., whether the person is subject to the UCMJ at the time of the offense.  Solorio v. United States, 483 U.S. 435 (1987).[8]  Our inquiry into

---

[8] Solorio overruled O'Callahan v. Parker, 395 U.S. 258 (1969), in which the Supreme Court held that court-martial jurisdiction depended on the "service connection" of the offense charged.  Solorio, 483 U.S. at 436.  In Solorio, the Supreme Court returned to its earlier precedent:  "[i]n an unbroken line of decisions from 1866 to 1960, this Court interpreted the Constitution as conditioning the proper exercise of court-

whether jurisdiction over the offense exists therefore requires an analysis of the criteria found in Article 2(a)(10); whether Appellant was subject to the UCMJ under its terms.

In its current form, Article 2(a)(10) reflects a long-standing principle that civilians serving alongside the military may be subject to courts-martial under the military justice system in some limited circumstances.  Prior to the founding of this country, the British Articles of War of 1765 provided for jurisdiction over "[a]ll Suttlers and Retainers to a Camp, and all persons whatsoever serving with Our Armies in the Field." British Articles of War of 1765, section XIV, art. XXIII, reprinted in William Winthrop, Military Law and Precedents 941 (2d ed., Government Printing Office 1920).  The first American Articles of War enacted in 1775 included this language from the British Articles.  American Articles of War of 1775, art. XXXII, reprinted in Winthrop, Military Law and Precedents at 956.  The Articles retained that language with only minor modifications until enactment of the Uniform Code of Military Justice in 1950. See Winthrop, Military Law and Precedents at 98.  When the UCMJ was enacted in 1950, under Article 2(10) courts-martial jurisdiction included, "[i]n time of war, all persons serving with or accompanying an armed force in the field."  Article 2(10), UCMJ (1950).

---

martial jurisdiction over an offense on one factor:  the

United States v. Ali, No. 12-0008/AR

In 1970 this court held that the term "time of war" in Article 2(a)(10) referred only to a "war formally declared by Congress." United States v. Averette, 19 C.M.A. 363, 365, 41 C.M.R. 363, 365 (1970). Since Congress had not formally declared war since World War II, the subsequent reach of Article 2(a)(10) was substantially reduced. However, in 2006 Congress amended the language of Article 2 in the 2007 National Defense Authorization Act to read "[i]n time of declared war or contingency operation," effectively nullifying Averette. 2007 National Defense Authorization Act, Pub. L. No. 109-364, § 552, 120 Stat. 2217 (2006) (emphasis added).[9] Thus, in its current form Article 2(a)(10) provides jurisdiction "[i]n time of declared war or contingency operation, [over] persons serving with or accompanying an armed force in the field." We address each of these statutory requirements in turn.[10]

---

military status of the accused." Id. at 439.

[9] Unfortunately there is virtually no legislative history in the Congressional Record that explains the congressional intent for including the amended language.

[10] In his ruling, the military judge evaluated the "four" elements of Article 2(a)(10), including "persons" and found "Congress' use of the broad term 'persons' encompasses the accused, who is a citizen of Iraq and a citizen of Canada." The parties do not dispute the application of the term "persons" to Ali.

United States v. Ali, No. 12-0008/AR

   1. "Contingency Operation"[11]

   Neither Ali nor the Government contest the military judge's finding that Operation Iraqi Freedom was a contingency operation as that term is defined in 10 U.S.C. § 101(a)(13) (2006).[12]

   2. "Serving With" or "Accompanying an Armed Force"

   Ali argues that because the terms "serving with" and "accompanying" are not defined in Article 2(a)(10), the Manual for Courts-Martial, or case law, the terms are ambiguous. Ali suggests that this court look to the Military Extraterritorial Jurisdiction Act (MEJA) and the North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA) for the definition of those terms as each excludes nationals of the host

---

[11] Although Ali does not argue that Operation Iraqi Freedom was not a contingency operation, he suggests that the statutory definition of contingency operation is overly broad and thus there is a risk that Article 2(a)(10) could be applied to civilians in a wide variety of circumstances.

[12] 10 U.S.C. § 101(a)(13) defines contingency operation as:

> [A] military operation that -- (A) is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or (B) results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of this title, chapter 15 of this title, or any other provision of law during a war or during a national emergency declared by the President or Congress.

country from its jurisdiction.[13]  Ali goes on to urge this court
to read into Article 2(a)(10) an exclusion of nationals of the
host nation because "it is evident that [he] is a member of a
class of persons that Congress intended to exclude from the
definition of serving with or accompanying an armed force in the
field."

In response, the Government refers us to United States v.
Burney, 6 C.M.A. 776, 788, 21 C.M.R. 98, 110 (1956),[14] where we
addressed the phrase "persons serving with or accompanying an
armed force."  In Burney, we stated that "[t]he test is whether
[the accused] has moved with a military operation and whether
his presence with the armed force was not merely incidental, but

---

[13] MEJA is applicable to civilian employees "employed by the
Armed Forces" which includes employees of a Department of
Defense or other qualifying federal agency contractor who are
outside the United States in connection with their employment
and who are not a national or ordinary resident of the host
nation.  18 U.S.C. § 3267(1) (2006).  MEJA limits the phrase
"accompanying the Armed Forces" to dependents of military
members, civilian employees of the Department of Defense, or
Department of Defense contractors.  18 U.S.C. § 3267(2) (2006).
The NATO SOFA defines "civilian component" as "the civilian
personnel accompanying a force of a Contracting Party who are in
the employ of an armed service of that Contracting Party, and
who are not stateless persons, nor nationals of any State which
is not a Party to the North Atlantic Treaty, nor nationals of,
nor ordinarily resident in, the State in which the force is
located."  Agreement between the Parties to the North Atlantic
Treaty regarding the Status of their Forces, art. I, ¶ 1(b),
June 19, 1951, 4 U.S.T. 1792, 199 U.N.T.S. 67.
[14] The defendant in Burney was a civilian employed by a
government contractor stationed at an Air Force base in Japan
when he was tried by court-martial for assault with a deadly
weapon in violation of Article 128, UCMJ.  Id. at 781-82.  The

15

directly connected with, or dependent upon, the activities of the armed force or its personnel." Id. We also noted that "an accused may be regarded as 'accompanying' or 'serving with' an armed force, even though he is not directly employed by such a force or the Government, but, instead, works for a contractor engaged on a military project." Id.

Nothing suggests that Congress could not have placed the limitations against application to host-country nationals found in MEJA within Article 2(a)(10), and we find it unnecessary to rely on the definitions found in either MEJA or the NATO SOFA, particularly when we have previously addressed those terms as used in Article 2(a)(10) in the military context. Thus, we look to the facts of this case in light of prior precedent to determine whether Ali was "serving with" or "accompanying the force." In his ruling on the motion to dismiss, the military judge found:

> The accused was serving with 1st Squad, 3rd Platoon, 170th Military Police Company. He served as an interpreter on every mission the squad went on. Not only was he an integral part of the team, he was the necessary part of the team. Without the accused, or another interpreter, the squad could not perform the military mission it had in Operation Iraqi Freedom. He was the only member of the team that was necessary. Even the squad leader, SSG Butler, could be replaced by another Soldier taking charge, and the mission could be accomplished.

---

Court of Military Appeals held that the exercise of court-martial jurisdiction was constitutional. Id. at 803.

The military judge identified several other factors indicating that Ali was serving with the Army, including:  he wore a tape stating "U.S. Army" and the unit patch for the 42nd Military Police Brigade on his uniform, as did the soldiers in his squad; he wore body armor and a helmet like the soldiers; he lived in a combat outpost, at first with other soldiers then with other interpreters; he received mission orders from the squad leader/team chief and reported for operational purposes to the squad leader/team chief; and when he had interpersonal conflicts he raised them with his military supervisors.

Additionally, the military judge found that Ali and the soldiers of 1st Squad faced daily threats from enemy insurgents operating in the area around Hit.  The squad was routinely attacked with improvised explosive devices, vehicle-borne explosive devices, small arms fire, precision small arms fire, and indirect fire.  As an interpreter, Ali would have been specifically targeted by the enemy in an attempt to inhibit United States Army communications capabilities.  For operational purposes, Ali's role as interpreter was integral to the mission of 1st Squad.  He was virtually indistinguishable from the troops serving in 1st Squad and he faced the same daily routines and threats as they did.

We conclude that Ali was both "serving with or accompanying" the soldiers of 1st Squad at the time of the offense.

### 3. "In the Field"

Ali urges this court to narrowly construe the meaning of "in the field" under Article 2(a)(10) in light of the Supreme Court precedent limiting military jurisdiction over civilians. Ali argues that the term "in the field" must be narrowly construed so as to require both (1) a contingency operation; and (2) the practical unavailability of a civilian criminal forum. The Government responds by noting that Colonel Winthrop broadly defined the phrase to mean "the period and pendency of war and to acts committed in the theater of war." The Government goes on to rely on the discussion in Burney in which this court stated that "in the field" means in an area of actual fighting. Burney, 6 C.M.A. at 787-88, 21 C.M.R. at 109-10.

Although the Supreme Court in Reid v. Covert analyzed the provisions of Article 2(11), the Court did distinguish and discuss the "in the field" requirement of then Article 2(10):[15]

> Experts on military law, the Judge Advocate General and the Attorney General have repeatedly taken the position that "in the field" means in an area of actual fighting. . . .
>
> Article 2(10) of the UCMJ, 50 U.S.C. § 552(10), provides that in time of war persons serving with or accompanying the armed forces in the field are subject

---

[15] Article 2(10) was the predecessor to today's Article 2(a)(10).

>   to court-martial and military law.  We believe that
>   Art. 2(10) sets forth the maximum historically
>   recognized extent of military jurisdiction over
>   civilians under the concept of "in the field."

354 U.S. 1, 34 n.61 (citations omitted).

We see no reason not to adopt this interpretation of "in the field," which requires an area of actual fighting, for our analysis of Article 2(a)(10).  Cf. Burney. 6 C.M.A. at 787-88, 21 C.M.R. at 109-10.  Ali and 1st Squad were living at a combat outpost and conducting their missions in and around Hit, where they faced attacks from enemy insurgents on a daily basis.  The military judge found that a typical mission required "mission preparations, safety brief, accountability, convoy to the mission site in up-armored HMMWVs, training of Iraqi Police . . . [and] conduct[ing] patrols with the Iraqi police."  There is little doubt that 1st Squad was in an area of actual fighting and thus, "in the field."

We therefore agree with the military judge and the CCA that Ali was serving with or accompanying an armed force in the field during a contingency operation.  The misconduct is punishable by Articles 107, 121, and 134, UCMJ, 10 U.S.C. §§ 907, 921, 934 (2006), and jurisdiction existed under Article 2(a)(10).

B.  Jurisdiction over the Person

Post-Solorio, the status of the individual is the focus for determining both jurisdiction over the offense and jurisdiction over the person.  See Harmon, 63 M.J. at 101 ("military

19

jurisdiction over the person continues as long as military status exists"); United States v. Murphy, 50 M.J. 4, 7 (C.A.A.F. 1998) (citing Solorio for the proposition that "the test for whether a military court-martial has jurisdiction to try an accused is the military status of the accused"). The only difference is that jurisdiction over the person depends on the person's status as a "person subject to the Code" both at the time of the offense and at the time of trial. Compare Solorio, 483 U.S. at 451, with United States v. Howard, 20 M.J. 353, 354 (C.M.A. 1985) ("It is black letter law that in personam jurisdiction over a military person is lost upon his discharge from the service, absent some saving circumstance or statutory authorization.").

Having agreed with the military judge that Ali was a person subject to the Code under Article 2(a)(10) at the time of the offense, we now must determine whether there was something that altered his status between the time of the offense and the time of trial. Ali argues that he no longer fell within Article 2(a)(10) at the time of trial because L3 fired him prior to his arraignment and he was no longer serving with or accompanying the force. The Government responds that it is clear that Ali was serving with and accompanying the force both at the time of the assault and at the time of trial and therefore the court-martial had jurisdiction.

We need not determine whether the termination of Ali's employment by L3 also terminated his status of "serving with" the force, as the facts demonstrate that he was still "accompanying the force." As noted in the analysis of R.C.M. 202(a):

> Although a person "accompanying an armed force" may be "serving with" it as well, the distinction is important because even though a civilian's contract with the Government ended before the commission of an offense, and hence the person is no longer "serving with" an armed force, jurisdiction may remain on the ground that the person is "accompanying an armed force" because of continued connection with the military.[16]

Manual for Courts-Martial, United States, Analysis of the Rules for Courts-Martial app. 21 at A21-11 to A21-12 (2008 ed.) (MCM). Thus, regardless of whether Ali continued to "serve with" an armed force after his civilian employment termination, he certainly continued to accompany the force while awaiting trial.[17] See Perlstein, 151 F.2d at 169 (holding that the jurisdictional question was not the defendant's employment status but whether he was still accompanying the Army at the time of the offenses); In re Di Bartolo, 50 F. Supp. 929, 931 (S.D.N.Y. 1943) (critical issue for purposes of jurisdiction was

---

[16] MCM explanations of offenses are not binding on this court, but are generally treated as persuasive authority. United States v. Miller, 67 M.J. 87, 89 (C.A.A.F. 2008).

[17] The fact that Ali's continued accompaniment was not voluntary is irrelevant for our analysis as his confinement was a direct result of his actions in violating his restriction to Victory Base Complex.

not whether accused had been terminated by government contractor at the time of court-martial, rather "[t]he primary issue is whether the petitioner accompanied the Armies of the United States").

Accordingly, we find the court-martial had jurisdiction over Ali. Having held that the court-martial had jurisdiction over Ali under the provisions of Article 2(a)(10), we turn to whether the exercise of that jurisdiction over Ali violated the Constitution.

II. Whether Congress's Exercise of Jurisdiction in Article 2(a)(10) Violates the Constitution

Ali's primary argument is that Article 2(a)(10) is unconstitutional as applied in this case because he was not afforded the protections of the Fifth and Sixth Amendments. The constitutionality of an act of Congress is a question of law that we review de novo. United States v. Disney, 62 M.J. 46, 48 (C.A.A.F. 2005). Where, as here, an appellant argues that a statute is "unconstitutional as applied,"[18] we conduct a fact-specific inquiry. See Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 289 (1921) ("A statute may be invalid as applied to one state of facts and yet valid as applied to another.") (citations omitted); Disney, 62 M.J. at 50-51 (determining, based on the facts of the case, that the statute at issue was

---

[18] Counsel for Ali asserted that his constitutional challenge was "as applied" at oral argument.

United States v. Ali, No. 12-0008/AR

"constitutional as applied to [a]ppellant's conduct"); United
States v. Marcum, 60 M.J. 198, 206-08 (C.A.A.F. 2004) (viewing
the case as a "discrete criminal conviction based on a discrete
set of facts" and determining that Article 125, UCMJ, 10 U.S.C.
§ 925 (2006), was "constitutional as applied to [a]ppellant").

To succeed in his as-applied challenge, Ali must show that
he was entitled to Fifth and Sixth Amendment protections and
that, under the facts of this case, these protections were
violated when he was subjected to military jurisdiction.  See
United States v. Salerno, 481 U.S. 739, 745 & n.3 (1987)
(describing the "heavy burden" required to assert a facial
challenge and noting how the appellant did not argue that the
legislative act was "unconstitutional because of the way it was
applied to the particular facts of their case").

A.  Fifth and Sixth Amendment Protections

Ali alleges that exercise of court-martial jurisdiction
violated his rights under the Fifth and Sixth Amendments, citing
the line of Supreme Court cases denying court-martial
jurisdiction over civilians.[19]  He argues those cases demonstrate

---

[19] United States ex rel. Toth v. Quarles, 350 U.S. 11, 23 (1955)
(holding that former servicemember was not subject to court-
martial); Covert, 354 U.S. at 5, 41 (court-martial did not have
jurisdiction during peacetime to try capital case against
civilian dependent of a servicemember); Kinsella v. United
States ex rel. Singleton, 361 U.S. 234, 249 (1960) (conviction
by court-martial of wife of serviceman for noncapital crime was
not constitutionally permissible); Grisham v. Hagan, 361 U.S.
278, 280 (1960) (overseas civilian employee of armed services

the Supreme Court's unwillingness to expand military jurisdiction to include civilians and urges the court to apply the same framework in this case, thereby rejecting an overly broad reading of Article 2(a)(10).  Ali highlights the Supreme Court's concern, reflected in Covert, 354 U.S. at 37, that courts-martial do not provide an accused the same protections as civil courts, specifically "trial by jury before an independent judge after an indictment by a grand jury."

Unlike Ali, the defendant in Covert was a United States citizen, and the Supreme Court's concern reflected the impermissible denial of constitutional protections to "an American citizen when [she] was tried by the American Government in [a] foreign land[] for offenses committed there."  354 U.S. at 5.  Indeed, all of the cases relied upon by Ali for the constitutional limitations on congressional extension of military jurisdiction over civilians involved United States citizens tried by court-martial not in a time of war.  None of these cases purported to address the issue before us, which is the constitutionality of military jurisdiction over a noncitizen tried outside of the United States during a contingency

---

was not subject to court-martial jurisdiction in capital case); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 283-84, 287 (1960) (overseas civilian employees of the Army and Air Force were not subject to court-martial jurisdiction during peacetime).

operation. Under the circumstances of this case, the concerns raised by the Supreme Court are not applicable.

However, we must first consider whether Ali, a foreign national being tried outside the United States for a crime committed outside the United States, enjoys the protections of the Fifth and Sixth Amendments which the Supreme Court was concerned with in Covert and the cases cited in note 19, supra. This threshold determination is critical to our analysis as Ali's primary constitutional argument relies on his assertion that he is in a position like that of the individuals the Supreme Court determined could not be subjected to military jurisdiction, see supra note 19, because he too is entitled to Fifth and Sixth Amendment protections.

In his brief and at oral argument Ali relied on United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), for the principle that he was entitled to fundamental due process rights under the Constitution because he was subjected to the judicial power of the United States. Verdugo-Urquidez was a Mexican citizen who was arrested for various drug offenses in Mexico on a United States arrest warrant. Id. at 262. He was later tried in a United States district court where he claimed that the search of his residence in Mexico by United States law enforcement violated his Fourth Amendment rights. Id. at 263. The Supreme Court held that the Fourth Amendment did not apply

25

where the search of a nonresident alien's home occurred in a foreign country.  Id. at 261.  While recognizing that the Supreme Court did not extend Fourth Amendment protections to Verdugo-Urquidez, Ali argues that since he was subjected to the judicial power of the United States, he was entitled to fundamental due process rights.

While Verdugo-Urquidez referenced several cases discussing constitutional protections applicable to aliens,[20] it also explained that "[t]hese cases . . . establish only that aliens receive constitutional protections when they have come <u>within the territory of the United States and developed substantial connections with this country</u>."  Id. at 271 (emphasis added). While there is no case law extending constitutional protections granted by the Fifth and Sixth Amendments to noncitizens who are tried overseas there is precedent to the contrary.  See, e.g., Johnson v. Eisentrager, 339 U.S. 763, 783 (1950) (rejecting the principle "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses"); United States v. Curtiss-Wright

---

[20] Verdugo-Urquidez, 494 U.S. at 270-71 (citing Plyler v. Doe, 457 U.S. 202, 211-12 (1982) (illegal aliens protected by Equal Protection Clause); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); Bridges v. Wixon, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); Wong Wing v. United States, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); Yick Wo v.

Export Corp., 299 U.S. 304, 318 (1936) ("Neither the

Constitution nor the laws passed in pursuance of it have any

force in foreign territory unless in respect of our own

citizens.").

In holding that the Fourth Amendment was not applicable to

a United States Government search of a home owned by a

nonresident alien located outside the United States, Verdugo-

Urquidez reiterated these principles in its discussion of

Eisentrager, which is instructive as to the constitutional

rights afforded to noncitizens outside the United States.  In

disposing of the Fourth Amendment claims which were raised in

Verdugo-Urquidez, the Supreme Court discussed the Fifth

Amendment claims that were raised in Eisentrager:

> Indeed, we have rejected the claim that aliens
> are entitled to Fifth Amendment rights outside the
> sovereign territory of the United States.  In Johnson
> v. Eisentrager, the Court held that enemy aliens
> arrested in China and imprisoned in Germany after
> World War II could not obtain writs of habeas corpus
> in our federal courts on the ground that their
> convictions for war crimes had violated the Fifth
> Amendment and other constitutional provisions.  The
> Eisentrager opinion acknowledged that in some cases
> constitutional provisions extend beyond the citizenry;
> "the alien . . . has been accorded a generous and
> ascending scale of rights as he increases his identity
> with our society."  But our rejection of
> extraterritorial application of the Fifth Amendment
> was emphatic:
>
> "Such extraterritorial application of organic law
> would have been so significant an innovation in the

---

Hopkins, 118 U.S. 356, 369 (1886) (Fourteenth Amendment protects
resident aliens)).

> practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment.  Not one word can be cited.  No decision of this Court supports such a view.  None of the learned commentators on our Constitution has even hinted at it.  The practice of every modern government is opposed to it."
>
> If such is true of the Fifth Amendment, which speaks in the relatively universal term of "person," it would seem even more true with respect to the Fourth Amendment, which applies only to "the people."

Verdugo-Urquidez, 494 U.S. at 269 (citations omitted).

At its core, Ali's argument suggests that regardless of that fact that he is a nonresident who is not a citizen of the United States and regardless of where the offense took place or where he was tried, so long as he is subjected to judicial processes of the United States, the Fifth and Sixth Amendments apply because he is a "person" who stands "accused," and is being tried by the United States.[21]  Once again, Eisentrager is instructive:

> We have pointed out that the privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection.  No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States.

---

[21] In Verdugo-Urquidez, the Chief Justice noted the contrast between the language of the Fourth Amendment which refers to "the people" with the language of the Fifth and Sixth Amendments which refer to "persons" and "accused."  494 U.S. at 265-66.

339 U.S. at 777-78 (emphasis added).  Ali's case is similar.

The offenses giving rise to the charges against Ali took place

outside the United States.

To be sure, the Supreme Court held well before its decision

in Eisentrager, that:

> all persons within the territory of the United States
> are entitled to the protection guarantied by [the
> Fifth and Sixth] amendments, and that even aliens
> shall not be held to answer for a capital or other
> infamous crime, unless on a presentment or indictment
> of a grand jury, nor be deprived of life, liberty, or
> property without due process of law.

Wong Wing, 163 U.S. at 238.  Those protections, however, are the

result of the alien's presence "within the territory" of the

United States.  Id.

Moreover, the Supreme Court has evaluated the question of

whether noncitizens are afforded the protections of the Fifth

and Sixth Amendments and has reasoned that aliens outside the

United States are not guaranteed those rights.  See, e.g.,

Curtiss-Wright, 299 U.S. at 318; Balzac v. Porto Rico, 258 U.S.

298 (1922) (one of "The Insular Cases," holding Sixth Amendment

right to jury trial inapplicable in Puerto Rico); Ocampo v.

United States, 234 U.S. 91 (1914) (Fifth Amendment grand jury

provision inapplicable in the Philippines); Dorr v. United

States, 195 U.S. 138 (1904) (jury trial provision inapplicable

in the Philippines).  Thus we find no precedent, and the parties

have not provided any law, which mandates granting a noncitizen

Fifth and Sixth Amendment rights when they have not "come within the territory of the United States and developed substantial connections with this country." Verdugo-Urquidez, 494 U.S. at 271. Neither Ali's brief predeployment training at Fort Benning, Georgia,[22] nor his employment with a United States corporation outside the United States constitutes a "substantial connection" with the United States as envisioned in Verdugo-Urquidez. Ultimately, we are unwilling to extend constitutional protections granted by the Fifth and Sixth Amendments to a noncitizen who is neither present within the sovereign territory of the United States nor has established any substantial connections to the United States. Whatever rights Appellant had were met through the court-martial process.[23]

We are mindful of the Supreme Court's repeated refusals to extend court-martial jurisdiction over civilians and recognize the high court's repeated caution against the application of

---

[22] The record indicates that Ali spent approximately seven days at Fort Benning, Georgia, for predeployment training. The training took place January 14, 2008, through January 21, 2008.

[23] In his separate opinion, Chief Judge Baker finds that Ali is entitled to the subset of Fifth and Sixth Amendment protections provided by the statutory safeguards embedded in the UCMJ. United States v. Ali, __ M.J. __ (17-19) (C.A.A.F. 2012) (Baker, C.J., concurring in part and in the result). We agree that the UCMJ provides some, but not all, Fifth and Sixth Amendment protections to those who fall within its jurisdiction, however Ali's fundamental argument remains based on the distinction between the full panoply of Fifth and Sixth Amendment rights afforded to United States citizens in other courts and the narrower range of these rights available to those subject to court-martial under the UCMJ.

military jurisdiction over anyone other than forces serving in active duty. Covert, 354 U.S. at 40 ("We should not break faith with this nation's tradition of keeping military power subservient to civilian authority, a tradition which we believe is firmly embodied in the Constitution."); Toth, 350 U.S. at 22 ("There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution."). However, those cases are factually distinguishable because the defendants in those cases were United States citizens who indisputably enjoyed the protections of the Fifth and Sixth Amendments.[24] See Covert, 354 U.S. at 32 (noting that like the defendant in Toth, the defendants were American citizens).[25]

---

[24] We note there is also precedent suggesting that civilians serving alongside the military may be subject to the military justice system. See, e.g., Duncan v. Kahanamoku, 327 U.S. 304, 313 (1946) (citing the "well-established power of the military" to assert jurisdiction over "those directly connected with" it); Ex parte Milligan, 71 U.S. 2, 123 (1866) ("Every one connected with [the military] . . . is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts."); see also discussion of British and American Articles of War supra pp. 12-13. But that question is not before us in this case.

[25] In his separate opinion, Chief Judge Baker notes the Supreme Court's call for the application of a "practical and contextual" analysis of constitutional law overseas in Boumediene v. Bush, 553 U.S. 723 (2008). Ali, __ M.J. at __ (21) (Baker, C.J., concurring in part and in the result). We agree that such an analysis is necessary in this case and note the Court's concern in Boumediene "[t]hat the petitioners in [Covert] were American citizens was a key factor in the case and was central to the plurality's conclusion that the Fifth and Sixth Amendments apply

Ali's claim that the application of Article 2(a)(10) to him violated the Constitution under the circumstances of this case fails.[26]

B. Necessary and Proper Clause

Citing Covert, Ali's second argument is that the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, cannot be used to extend Congress's power to authorize court-martial jurisdiction over civilians under art. I, § 8, cl. 14 because the term "land and naval Forces" refers only to members of the armed forces.

As an initial matter, Congress has the power to "declare War" and to "make Rules for the Government and Regulation of the land and naval Forces."  U.S. Const. art. I, § 8, cls. 11, 14. These powers are separate and distinct sources of constitutional authority for congressional action.  See Solorio, 483 U.S. at 441.  Moreover, we recognize that "the Necessary and Proper Clause cannot extend the scope of Clause 14."  Covert, 354 U.S. at 21.  In this case we find the Government's argument that Article 2(10) was based on clause 14 and that Ali was a member of the "land and naval Forces" unpersuasive, but this is of no moment.  The Supreme Court has cited Congress's "war powers" as the constitutional source of authority and justification for

_____

to American civilians tried outside the United States."
Boumediene, 553 U.S. at 760.

federal court decisions which "upheld military trial of civilians performing services for the armed forces 'in the field' during time of war."[27]  Covert, 354 U.S. at 33 ("To the extent that these cases can be justified, insofar as they involved trial of persons who were not 'members' of the armed forces, they must rest on the Government's 'war powers.'" (citing Perlstein, 151 F.2d 167; Hines v. Mikell, 259 F. 28 (4th Cir. 1919)); Ex parte Jochen, 257 F. 200 (S.D. Tex. 1919); Ex parte Falls, 251 F. 415 (D.N.J. 1918); Ex parte Gerlach, 247 F. 616 (S.D.N.Y. 1917); Shilman v. United States, 73 F. Supp. 648 (D.C.N.Y. 1947), rev'd in part, 164 F.2d 649 (2d Cir. 1947); In re Berue, 54 F. Supp. 252 (S.D. Ohio 1944); McCune v. Kilpatrick, 53 F. Supp 80 (E.D. Va. 1943); In re Di Bartolo, 50 F. Supp. 929 (S.D.N.Y. 1943))).

C.  Reasonable Availability of Article III Forum

In the alternative, the Amici Navy-Marine Corps and Air Force Appellate Divisions argue that in Toth and Singleton the Supreme Court held that "if Congress reasonably could provide an Article III forum for the trial of civilians accompanying the military overseas, a court-martial is unconstitutional."  Amici also argue that the "availability" of a civilian court is merely

---

[26] This case does not present a situation involving a United States citizen and we take no position as to that issue.
[27] We recognize that Ali was in Iraq pursuant to a contingency operation rather than a declared war.  However, we are also

a question of logistics and that military authorities could have transported Ali back to the United States for trial in an Article III court. (Citing Toth, 350 U.S. at 23 (suggesting that Congress use the "least possible power adequate to the end proposed")). In other words, court-martial jurisdiction over civilians is unnecessary when there are "available alternatives" which guarantee constitutional protections.

Leaving aside the fact that MEJA expressly provides for concurrent jurisdiction with courts-martial, the problem this argument presents is that no Article III alternative exists under the facts of this case. While MEJA extends to civilians "employed by or accompanying the Armed Forces," 18 U.S.C. § 3261(a) (2006), which likely includes non-United States citizens, cf. United States v. Brehm, No. 1:11-cr-11, 2011 U.S. Dist. LEXIS 33903, at *3, 2011 WL 1226088, at *1. (E.D. Va. Mar. 30, 2011) (finding that MEJA extended to a South African civilian contractor who worked for the Department of Defense in Afghanistan), it does not extend to citizens of the host nation. See 18 U.S.C. § 3267(1)(C), (2)(C) (excepting all "national[s] of or [those] ordinarily resident in the host nation"). Thus, there is no available alternative forum here, and Congress used

---

cognizant of the nature of the conflict and the existence of actual hostilities.

United States v. Ali, No. 12-0008/AR

the "least possible power adequate" to try Ali in this case.

Toth, 350 U.S. at 23.[28]

### III. Fosler/Ballan Issue

Charge III and its specification alleged a violation of Article 134, UCMJ, specifically that Ali "[d]id, at or near Combat Outpost 4, Iraq, o/a 23 Feb 08, wrongfully endeavor to impede an investigation in the case of himself and H.A.U. by wrongfully hiding evidence, to wit: the knife which injured H.A.U." The specification did not contain reference to the terminal elements of clauses 1 or 2 of Article 134, prejudice to good order or discipline or service discrediting conduct.

Ali pled guilty to Charge III. The stipulation of fact, signed by Ali, stated that "Mr. Ali's conduct was prejudicial to good order and discipline in that it impeded the Soldiers of the 170th MP Company in their efforts to determine the facts of the physical altercation, the reasons for the fight and the means of Mr. Al-Umarryi's injuries." During the providence inquiry, the military judge explained the elements of prejudice to good order and discipline and service discrediting conduct to Ali. Ali stated that his conduct was prejudicial to good order and

---

[28] In regard to the issue raised in Senior Judge Effron's separate opinion, Ali, __ M.J. at __ (7) (Effron, S.J., concurring in part and in the result), our holding is limited to the narrow circumstances presented by this case, namely the exercise of court-martial jurisdiction over a dual citizen of the host country and a third country. We do not reach the

35

discipline.  Ali's case is factually analogous to United States v. Ballan, 71 M.J. 28 (C.A.A.F. 2012).  Ballan pled guilty to an Article 134 charge which omitted the terminal element, entered into a pretrial agreement, submitted a stipulation of fact which addressed the terminal element, and indicated that he understood the nature of the prohibited conduct during the providence inquiry.  Id. at 30-35.  This court applied a plain error review and found no material prejudice to Ballan's substantial rights.  Id.  Similarly, we find no material prejudice to Ali's substantial rights in light of the error in Charge III.

## Decision

The decision of the United States Army Criminal Court of Appeals is affirmed.

---

question of the constitutionality of court-martial jurisdiction over a noncitizen who is not also a host-country national.

36

United States v. Ali, No. 12-0008/AR

BAKER, Chief Judge (concurring in part and in the result):

INTRODUCTION

I concur in the reasoning and the result with respect to Issue II.[1]  I write separately regarding Issue I because, while I agree with the result, I believe the essential and threshold question in this case is whether Congress possesses the authority to amend the Uniform Code of Military Justice (UCMJ) to include within its jurisdiction civilian contractors serving with or accompanying the United States Armed Forces.  Working forward from Article I of the United States Constitution, rather than backward from the Bill of Rights, Congress must have an enumerated and positive authority to act, even if its actions would not otherwise run afoul of the Bill of Rights.  Thus, the military judge had it exactly right:  "The two issues in this motion are whether the accused falls within the terms delineated by Congress in Article 2(a)(10), and, if so, whether Congress has the power under the United States Constitution to extend the jurisdiction of courts-martial to that extent."

Only if one determines that Congress has an affirmative power to act, does one need to then consider whether it has done

_____

[1] I concur in the result with regards to Issue III, but for reasons stated in my concurring opinion in United States v. Ballan, 71 M.J. 28, 36 (C.A.A.F. 2012) (Baker, C.J., concurring in the result), and my dissenting opinion in United States v. Fosler, 70 M.J. 225, 240 (C.A.A.F. 2011) (Baker, J., dissenting), I conclude that Appellant was on fair notice of the Article 134, UCMJ, 10 U.S.C. § 934 (2006), charge.

so in a manner consistent with the Bill of Rights and in particular the Fifth and Sixth Amendments.  In this regard, the majority goes too far in concluding that the Amendments do not apply overseas to noncitizens:  "Ultimately, we are unwilling to extend constitutional protections granted by the Fifth and Sixth Amendments to a noncitizen who is neither present within the sovereign territory of the United States nor established any substantial connections to the United States."  United States v. Ali, __ M.J. __ (30) (C.A.A.F. 2012).  The Supreme Court offers a more nuanced approach stating that "questions of extraterritoriality [in the application of constitutional rights] turn on objective factors and practical concerns, not formalism."  Boumediene v. Bush, 553 U.S. 723, 764 (2008).

With respect to Appellant's Fifth and Sixth Amendment arguments, in this case, the only question we need to reach expressly, or by implication, is whether the Government violated Appellant's Fifth and Sixth Amendments in the manner in which it prosecuted him, as an Iraqi and Canadian national serving as a combat translator while embedded in a United States military unit in combat operations in Iraq.  Appellant wore the same uniform as the other members in his squad, served as an interpreter on every mission the squad went on, and lived with and near other soldiers in his squad.  Without Appellant his

team could not perform its military mission.  Thus, he was an integral member of this United States military unit.

In my view, if Appellant was sufficiently connected with the Armed Forces to qualify for UCMJ court-martial jurisdiction as a matter of statutory and constitutional law, then he was also sufficiently connected to the Armed Forces to be entitled to those rights embedded in the UCMJ to which members of the Armed Forces are entitled, including those rights and rules that are derived from the Fifth and Sixth Amendments.  What he was not entitled to were rights extending beyond those provided to members of the Armed Forces as a matter of constitutional law.

DISCUSSION

A.  Congressional Authority to Act

The threshold question presented by Appellant is a structural one.  Does Congress have authority to prescribe court-martial jurisdiction over certain contractors serving with or accompanying the United States Armed Forces?  That is because "[t]he Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic." United States v. Verdugo-Urquidez, 494 U.S. 259, 277 (1990) (Kennedy, J., concurring); see also Reid v. Covert, 354 U.S. 1, 6 (1957) (plurality opinion) (the United States "can only act in accordance with all the limitations imposed by the Constitution"); United States v. Comstock, 130 S. Ct. 1949, 1956

(2010) ("[T]he Federal '[G]overnment is acknowledged by all to be one of enumerated powers,' which means that '[e]very law enacted by Congress must be based on one or more of' those powers.") (2d and 3d set of brackets in original) (citations omitted). If Congress does not have the power to legislate jurisdiction in this manner, then we need not reach the Bill of Rights issues. Moreover, the fact that an action does not violate Appellant's Fifth or Sixth Amendment rights does not mean that the Congress has an enumerated or implied authority to take the predicate action in question.

The Government identifies Article I, Section 8, Clause 14, as its source of affirmative authority for Congress's action. This clause states that "The Congress shall have Power . . . [t]o make Rules for the Government and Regulation of the land and naval Forces." Indeed, the Government rests its case upon this clause. Appellant, on the other hand, argues that his court-martial lacked jurisdiction because Congress exceeded its legislative authority when it amended the UCMJ to extend court-martial jurisdiction to reach civilians during contingency operations. Appellant relies on Supreme Court case law for the proposition that civilians may not be subject to military court-martial generally, but to the extent they can, it can only occur in the narrowest of circumstances necessitated by the lack of a civilian alternative. Therefore, he argues that this Court

should reject the application of court-martial jurisdiction to him.  See also Covert, 354 U.S. at 5 (rejecting court-martial jurisdiction over American civilian dependants of servicemembers stationed at a United States Air Force base in England and a post in Japan); United States ex rel. Toth v. Quarles, 350 U.S. 11, 23 (1955) (rejecting court-martial jurisdiction over civilian ex-servicemember); Ex parte Milligan, 71 U.S. (4 Wall.) 2 (1866) (concluding that a citizen not connected with military service could not be tried by a military court when civilian courts are still operating).

Addressing the Government's argument first, on the one hand, there is no question that Appellant was not a member of the land and naval forces at the time of his offense or at the time he was court-martialed.  If he was, there would have been no reason to charge him under Article 2(a)(10), UCMJ, 10 U.S.C. § 802(a)(10) (2006), as a civilian contractor serving with or accompanying the Armed Forces.  On the other hand, the Supreme Court has recognized that the authority under this clause may extend beyond those persons formally inducted into the United States Armed Forces.  "[T]here might be circumstances where a person could be 'in' the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform."  Covert, 354 U.S. at 23.

In my view, Appellant was certainly serving with and thus also accompanying the United States Armed Forces, but he was neither a member of the United States Armed Forces nor "in" the United States Armed Forces. If he were, then the Government should have charged him under Article 2(a)(1), UCMJ. Therefore, to the extent Congress's authority is based on Article I, Section 8, Clause 14 (Rules and Regulations Clause) it must be derived from an authority that is either implied from this clause or is necessarily and properly derived from this clause on the theory that if Congress is to govern and regulate the United States Armed Forces effectively, it must also be able to govern and regulate those who serve with and accompany the United States Armed Forces as well. This assertion, however, must be balanced against the Supreme Court's continuing admonition that "the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction" with respect to civilians. Covert, 354 U.S. at 21. This admonition includes courts-martial established pursuant to the UCMJ.

In the current legal context, I do not find sufficient positive authority to reach this result on the authority implied from Article I, Section 8, Clause 14 alone. Thus, if the Congress is to have authority to prescribe court-martial jurisdiction over civilian contractors serving with or accompanying the armed forces in the field, additional and

6

complementary authority must be found somewhere in the Constitution outside of the Rules and Regulations Clause.  In this case, the military trial judge and the United States Army Court of Criminal Appeals (CCA) relied upon Congress's enumerated and implied war powers as well as its authority to make rules and regulations.  United States v. Ali, 70 M.J. 514, 519-20 (A. Ct. Crim. App. 2011).  These powers are found, among other places, in Article I, Section 8, and include the power to: "lay and collect taxes . . . to . . . provide for the common Defense"; "define and punish . . . [o]ffenses against the Law of Nations"; declare war; make Rules concerning Captures on Land and Water; raise and support armies; provide and maintain a navy; and to provide for organizing, arming, and disciplining the military.  U.S. Const. Art. I, §8 cls. 1, 10-13, 16.  Congress also has the more general enumerated power of the purse and authority to pass such laws as are "necessary and proper" to effectuate its enumerated authorities.  U.S. Const. Art. I, §8, cl. 18.  The Supreme Court has noted that the war powers provide "considerably more extensive" authority than Article I, Section 8, Clause 14 alone.  United States v. Averette, 19 C.M.A. 363, 364, 41 C.M.R. 363, 364 (1970) (citing Covert, 354 U.S. at 33).

While different courts, scholars, Congresses and Presidents will point to different clauses within this lexicon to describe and delimit Congress's power, all will in some manner describe

it as relating to the war powers.  Most will also recognize that the war powers are in some manner both exclusive and shared with the President who serves as commander in chief and chief executive and exercises enumerated and implied powers over foreign affairs.  U.S. Const. art. II, § 1, cl. 1, § 2 cls. 1-2; American Ins. Ass'n v. Garamendi, 539 U.S. 396, 414 (2003) ("Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring))).  At the same time, as Justice Jackson noted in Youngstown, executive branch lawyers are loath to describe or define this power with specificity lest they in some manner limit its future and necessary use.  See Youngstown, 343 U.S. at 641 (1952) (Jackson, J., concurring).

Courts are cautious as well.  Id. at 635.  This is based on considerations of deference and other considerations generally falling into the rubric of the political question doctrine.  See Nixon v. United States, 506 U.S. 224, 228 (1992) (a controversy "involves a political question[] where there is a textually demonstrable constitutional commitment of the issue to a

8

coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it" (quoting Baker v. Carr, 369 U.S. 186, 217 (1962))); see also Carr, 369 U.S. at 211 (emphasizing that resolution of foreign-relations issues "frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views") (footnote omitted).  For example, the Supreme Court, in discussing the nonjusticiability of a case involving military policy, emphasized that:

> it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

Gilligan v. Morgan, 413 U.S. 1, 10 (1973).  One reason this Court was established was to provide a mechanism of civilian appellate review that had, or could develop, expertise in military justice.  See Noyd v. Bond, 395 U.S. 683, 694 (1969) (noting that Congress deliberately chose to confide appellate jurisdiction over courts-martial in a "specialized Court of Military Appeals, so that disinterested civilian judges could gain over time a fully developed understanding of the distinctive problems and legal traditions of the Armed Forces").

Here, the Government's assertion of jurisdiction is based in part on the war powers.  Where that exercise results in the deprivation of individual liberty, some explanation is warranted beyond the majority's single statement that "[t]he Supreme Court has cited Congress's 'war powers' as the constitutional source of authority and justification for federal court decisions which 'upheld military trial of civilians performing services for the armed forces'" in the context of World War I and World War II. Ali, __ M.J. at __ (32-33) (quoting Covert, 354 U.S. at 33).  A number of principles are apparent.

First, court-martial jurisdiction over civilians is "a very limited and extraordinary jurisdiction" and "was intended to be only a narrow exception to the normal and preferred method of trial in [civilian] courts of law." Covert, 354 U.S. at 21.  In Toth, the Supreme Court concluded that "the constitutional power of Congress to authorize trial by court-martial [over civilians] presents another instance calling for limitation to 'the least possible power adequate to the end proposed.'"  350 U.S. at 23 (quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 230-31 (1821)); see also McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 286 (1960) (restating the Toth doctrine that Congress must use "the least possible power adequate to the end proposed" when defining court-martial jurisdiction over civilians (quoting Toth, 350 U.S. at 23)).  While Congress

10

amended Article 2(a)(10), UCMJ, to apply in either a contingency operation or declared war, "a strict and literal construction" of court-martial jurisdiction over civilians should be applied. Averette, 19 C.M.A. at 365, 41 C.M.R. at 365; see also William Winthrop, Military Law and Precedents 100 (2d ed., Government Printing Office 1920) (1895) (discussing that the predecessor of Article 2(a)(10), UCMJ, Article 63 of the Articles of War, in creating exceptional jurisdiction over civilians is to be "strictly construed").  This case involves a narrow application of Article 2(a)(10), UCMJ, to an Iraqi and Canadian national serving with and accompanying the United States Armed Forces on its missions during wartime in Iraq.

Second, at the same time, courts have long accepted and affirmed an appropriate exercise of court-martial jurisdiction over civilians.  This jurisdiction is most appropriate in the context of armed conflict where it is not feasible or practicable to suspend military operations to pursue the transfer of persons back to the United States for trial.  Thus, there have been a number of decisions by lower courts during the twentieth century upholding court-martial jurisdiction over civilians accompanying or serving with the armed forces "in the field."  See Perlstein v. United States, 151 F.2d 167 (3d Cir. 1945); In re Berue, 54 F. Supp. 252 (S.D. Ohio 1944); In re Di Bartolo, 50 F. Supp. 929 (S.D.N.Y. 1943); McCune v. Kilpatrick,

53 F. Supp. 80 (E.D. Va. 1943).  The Supreme Court has not disturbed the legitimacy of these opinions.  Moreover, the Court noted in Covert that "[t]o the extent that these cases can be justified, insofar as they involved trial of persons who were not 'members' of the armed forces, they must rest on the Government's 'war powers.'"  354 U.S. at 33.

Third, with respect to the application of Article 2(a)(10), UCMJ, to Appellant, there is no question that the context is one in which the war power is being exercised and that Appellant's conduct fell within the ambit of that exercise of the war powers.  Exercising its war powers, Congress specifically authorized the conflict in Iraq with the Authorization for Use of Military Force against Iraq Resolution of 2002.  H.R.J. Res. 114, 107th Cong. (2002) (enacted).  Appellant was serving as a combat linguist in Iraq pursuant to both Congress's exercise of the war powers as well as the President's.  As the military judge noted, Appellant's duties were crucial to the success of the United States mission.  Appellant was "the direct link between the squad and the Iraqi Police officers being trained. Without an interpreter, the squad could not function and could not accomplish its mission."

Fourth, a functional approach should be taken when determining the narrow and extraordinary limits of court-martial jurisdiction over civilians.  In Boumediene, the Supreme Court

discussed the extraterritorial application of the Constitution and demonstrated a clear focus not on formalism, but on what is practical.[2] 553 U.S. at 764. The Court rejected a formalistic test of sovereignty and citizenship when determining the reach of the Constitution. While Appellant cites the Toth doctrine to argue that Congress did not use "the least possible power adequate to the end proposed," and thus as long as civilian courts were open in the United States, Congress could not allow the military to exercise court-martial jurisdiction over civilians, Appellant ignores key facts. See Ex parte Milligan, 71 U.S. (4 Wall.) at 127.

By court-martialing Appellant, the Government sought to maintain discipline in the military and combat context as well as to provide for criminal justice. The war powers and the commander in chief's authority surely include the power to

_____

[2] It is worth noting that in Covert objective factors, including place of confinement and trial, unrelated to the petitioner's citizenship were relevant to each of the justices constituting the majority. As the Court points out in Boumediene, 553 U.S. at 759, Justice Black, writing for the plurality, contrasted the particular facts in Covert with previous cases concerning the extraterritorial application of the Constitution. 354 U.S. at 14 (plurality). Justice Frankfurter, concurring, argued that "the 'specific circumstances of each particular case" are relevant in determining the geographic scope of the Constitution. Id. at 54 (Frankfurter, J., concurring). Finally, Justice Harlan, concurring, rejected a "rigid and abstract rule" for determining the extension of constitutional guarantees. Id. at 70 (Harlan, J., concurring). The Court in Boumediene emphasized that practical factors are serious considerations in determining the extraterritorial application of the Constitution. 553 U.S. at 755-64.

discipline civilians serving with the United States Armed Forces in hostilities where it is "absolutely essential to maintain[] discipline among troops in active service," or would be disruptive to combat operations. See Toth, 350 U.S. at 22 (noting that court-martial jurisdiction over civilians should be limited to the "narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service"); Ex parte Milligan, 71 U.S. (4 Wall.) at 126-27 (discussing necessity required to impose martial law). Appellant's reading of Toth would require the military to ship host-country contractors home for even minor offenses. This also suggests that if Appellant had committed more serious offenses, Congress would not have had the authority to prosecute him either. This is also inconsistent with Boumediene. Appellant "was enmeshed within a military unit both during duty time, when he was a required and integral part of accomplishing the military mission, and during off-duty time, when he lived in close proximity with and relied on the military unit to control the society within which he lived." Indeed, the military judge found that the medical absence of the victim, who was also a combat translator, rendered his squad "mission incapable" for five days. If Congress could not extend court-martial jurisdiction to Appellant in this context the United States could not at one time hold Appellant responsible for his

criminal offenses and provide for the military discipline and readiness of a combat unit in the field.

Fifth, because the law does not prohibit the exercise of court-martial jurisdiction over civilians per se, or on its face, the scope of the exercise of authority here is limited by the as-applied nature of Appellant's challenge.  In this case, Appellant has received the same rights afforded to military servicemembers accused of violating the UCMJ, including the right to counsel and the right to appeal.[3]  Therefore, we are not addressing a case of a civilian prosecuted in court-martial without recourse to appeal, including appeal before a civilian court, i.e., this Court.  While jurisdiction could, in theory, be exercised under Article 2(a)(10), UCMJ, in the context of domestic security operations within the continental United States, we do not face that situation here.[4]  Congress's authority to define jurisdiction in the manner that it has is clearly strongest overseas in the case of active hostilities exemplified here.

---

[3] This latter right has been afforded to Appellant as a matter of executive discretion and grace, but that does not negate the fact that it was provided.

[4] Note that Operation Noble Eagle, Executive Order 13223, applied domestically (ordering reserves to active duty and delegating certain authority to the secretaries of the departments of Defense and Transportation to respond to threat of further attacks after September 11, 2001).  Exec. Order No. 13223, 66 Fed. Reg. 48, 201 (Sept. 14, 2001).

Based on the foregoing analysis, the military judge and the CCA have it right. The real question in this case is whether the combination of the Rules and Regulations Clause, the war powers, and the Necessary and Proper Clause authorized Congress to legislate court-martial jurisdiction over this contractor, in this context. While Appellant was not a member of the United States Armed Forces, the war powers are implicated by the fact that Appellant was serving with and accompanying a military unit in combat and was an integral part of the unit and its mission. The state of hostilities, as authorized by Congress and the President, expands the exercise of Congress's authority from one relying solely on the Rules and Regulations Clause to one that also rests upon the war powers by focusing on actual hostilities and the location where actual hostilities are taking place. As the military judge pointed out, "[a] deployed military unit without discipline is nothing more than an armed mob roaming a foreign country. Actual hostilities are a part of the environment in which the armed forces are conducting their military missions." Therefore, the extension of court-martial jurisdiction to Appellant, under the particular facts of this case, is permissible pursuant to the Rules and Regulations Clause of the United States Constitution and the war powers.

United States v. Ali, No. 12-0008/AR

B.  Fifth and Sixth Amendments

Concluding that Congress does have the authority to prescribe jurisdiction in this manner, one must then ask whether it has done so in a constitutional manner.  Appellant argues that the military violated his Fifth and Sixth Amendment rights when it exercised jurisdiction over him pursuant to Article 2(a)(10), UCMJ.  Specifically, Appellant argues that the court-martial lacked three fundamental protections provided in Article III courts, an independent judge, grand jury indictment, and a jury trial.

The military judge at trial concluded that "the Sixth Amendment right to trial by jury does not apply to trials by courts-martial."  The military judge also concluded, "Because this is a case arising in the land or naval forces, the Fifth Amendment explicitly states that the accused has no such right at his court-martial."  The CCA affirmed this position: "[B]ecause we find that the exercise of military jurisdiction over appellant was proper, we find no violation of either the Fifth or Sixth Amendment of the United States Constitution by the military judge."  United States v. Ali, 70 M.J. 514, 520 (A. Ct. Crim. App. 2011).  The majority affirms this position as well, but does so by relying on an expansive theory.  It concludes that "constitutional protections granted by the Fifth and Sixth Amendments [do not extend] to a noncitizen who is

17

neither present within the sovereign territory of the United States nor established any substantial connections to the United States." Ali, __ M.J. at __ (30).

I conclude that Appellant's Fifth and Sixth Amendment rights were not violated by his court-martial, but through a distinct and narrower analysis. As the military judge noted, the Constitution delimits the application of Fifth and Sixth Amendment to members of the United States Armed Forces. "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; . . . ." U.S. Const. amend. V. This exception to the requirement of indictment by grand jury "has been read over into the Sixth Amendment so that the requirements of jury trial are inapplicable." Covert, 354 U.S. at 37 n.68 (citing Ex parte Quirin, 317 U.S. 1, 40 (1942)). The Supreme Court has upheld this limitation in the context of courts-martial. See, e.g., Ex parte Milligan, 11 U.S. (4 Wall.) at 123; Ex parte Quirin, 317 U.S. at 40. And, the Supreme Court and this Court have also recognized that constitutional rights may apply differently in the military context. United States v. Marcum, 60 M.J. 198, 205 (C.A.A.F. 2004) (citing Parker v. Levi, 417 U.S. 733, 743 (1974)).

It seems to me that if a civilian is sufficiently integrated into the United States Armed Forces to qualify for court-martial jurisdiction under Article 2(a)(10), UCMJ, then that same person is sufficiently integrated so as to be entitled to those Fifth and Sixth Amendment rights embedded in the UCMJ. Certainly this principle should apply in this narrow case where a foreign-national contractor served in the key role of a combat interpreter, was fully integrated into the military mission of his squad, lived with the squad, and wore the same clothing and equipment as members of the squad. What he was not entitled to were the rights to a jury trial and indictment by grand jury -- rights that extend beyond those to which members of the United States Armed Forces are themselves entitled.

It is also a conclusion founded on the provision of rights rather than a declaratory preclusion of rights. Under the majority's reasoning, Appellant essentially has no rights, other than those that the Executive and Congress have chosen to provide as a matter of discretion and grace through the operation of the UCMJ. Because the majority concludes that a noncitizen abroad has no Fifth or Sixth Amendment rights, this analysis would apply whether the court-martial was adjudicating a death penalty sentence or one for unauthorized absence.

To rule this conclusion, the majority relies on United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), a Fourth

Amendment case, for the proposition that "a foreign national being tried outside the United States for a crime committed outside the United States[] enjoys" no protections under the Fifth or Sixth Amendments.  Ali, __ M.J. at __ (25).  I would not rely on Verdugo-Urquidez to reach this result.

First, Verdugo-Urquidez is a Fourth Amendment case, and as the Court itself recognized, the Fourth Amendment is not the same as the Fifth Amendment.[5]  494 U.S. at 264.

Second, reliance on the substantial connection test drawn from Verdugo-Urquidez seems particularly inapt in this case, because it creates something of a legal oxymoron.  On the one hand, Appellant has sufficient connection to the United States and the United States Armed Forces to be serving with or

---

[5] The Supreme Court stated:

> Before analyzing the scope of the Fourth Amendment, we think it significant to note that it operates in a different manner than the Fifth Amendment, which is not at issue in this case. . . .
>
> . . . .
>
> That text [of the Fourth Amendment], by contract with the Fifth and Sixth Amendments, extends its reach only to the "the people."
>
>  . . . .
>
> The language [of the Fourth Amendment] contrasts with the words "person" and "accused" used in the Fifth and Sixth Amendments regulating procedure in criminal cases.

Verdugo-Urquidez, 494 U.S. at 264-66.

accompanying the United States Armed Forces for the purposes of establishing court-martial jurisdiction.  But, on the other hand, his connection is not substantial enough to warrant application of the Fifth or Sixth Amendments.  In my view, service with the Armed Forces of the United States in the uniform of the United States in sustained combat is a rather substantial connection to the United States.

Third, as noted in Part A, in Boumediene the Supreme Court noted that constitutional law overseas should not be applied in a formalistic manner, but in a practical and contextual manner. Johnson v. Eisentrager rejected the argument "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses."  339 U.S. 763, 783 (1950).  Verdugo-Urquidez stated that Eisentrager's rejection of the Fifth Amendment was "emphatic."  494 U.S. at 269.  However, the Court has pulled back from such broad strokes in recent years.  For example, the Court in Boumediene emphasized "that questions of extraterritoriality turn on objective factors and practical concerns, not formalism."  553 U.S. at 764.  Thus, Boumediene appears to significantly limit the blanket reach of both Verdugo-Urquidez and Eisentrager in favor of the more contextual and nuanced view expressed above.

United States v. Ali, No. 12-0008/AR

Fourth, and perhaps most importantly, the majority's analysis would seem to apply in verbatim manner to noncitizens serving in the United States Armed Forces today to whom this Court routinely applies the rights guaranteed by the Fifth and Sixth Amendments, as evidenced by the fact that our cases have never asked whether the accused is a United States citizen. Noncitizens are eligible to serve as enlisted members of the United States Armed Forces, and, as of 2010, 16,500 noncitizens were serving in the military, making up about 1.4 percent of enlisted members.  Office of the Under Secretary of Defense, Personnel and Readiness, Population Representation in the Military Services:  Fiscal Year 2010 Summary Report at 39 (2011) (38th annual report).  Between 1999 and 2008, around 70,000 noncitizens enlisted, making up four percent of non-prior service accessions into active-duty.  Molly F. McIntosh et al., CNA, Non-Citizens in the Enlisted U.S. Military 5 (2011).  To the extent there is a distinction based on citizenship, it would seem to depend on the distinction between serving as a fully integrated contractor while wearing the uniform and serving in the United States Armed Forces.  There is a distinction, but in my view, it is a tenuous distinction, for both forms of service would appear to establish a substantial connection to the United States, at the very least in a descriptive manner.

I see it differently.  Because Appellant was fully integrated into the United States Armed Forces, as described in Part A, and therefore subject to court-martial jurisdiction, he has those same rights as are provided to members of the military pursuant to the UCMJ, which after all is the same UCMJ pursuant to which he was being prosecuted.  Some, but not all, of those rights are of course a reflection of and implementation of Fifth and Sixth Amendment principles.  Thus, Appellant is not without the protections of the Fifth and Sixth Amendments because, when subject to court-martial jurisdiction, he is protected by at least some of these principles because they are embedded in the UCMJ and the Manual for Courts-Martial, United States.  What constitutional rights he did not have, as servicemembers do not have, were the right to an indictment by grand jury and trial by civilian jury.  For these reasons, I reach the same result but break in a decidedly different analytic direction than the majority.

In conclusion, as the military judge noted at trial, the question presented is whether Congress, in an exercise of its authority under Article I to make rules and regulations and pursuant to its war powers, can subject this foreign national, in this context, to court-martial jurisdiction and limit his rights to those provided under the UCMJ, a code that already applies to United States military personnel.  I conclude that

23

United States v. Ali, No. 12-0008/AR

Congress possesses the authority to amend the UCMJ to include within its jurisdiction civilian contractors serving with or accompanying the United States Armed Forces and that, in this case, the exercise of court-martial jurisdiction did not violate Appellant's Fifth or Sixth Amendment rights.

<u>United States v. Ali</u>, No. 12-0008/AR

EFFRON, Senior Judge (concurring in part and in the result):

Appellant, an Iraqi national, worked as a civilian employee for a Department of Defense (DoD) contractor during the period of major American combat operations in Iraq.  <u>See</u> Article 2(a)(10), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802(a)(10) (2006) (providing for court-martial jurisdiction over persons "serving with or accompanying an armed force in the field" during a "contingency operation").  At trial and on appeal, he has contested the jurisdiction of his court-martial on both statutory and constitutional grounds.

The majority opinion affirms Appellant's conviction, but on grounds broader than necessary for the resolution of this case. For the reasons set forth below, I concur only with respect to: (1) Part II.C. of the majority opinion (addressing jurisdiction from the perspective of Appellant's status as a host-country national whose conduct was excluded from Article III coverage by statute); and (2) Part III of the majority opinion (disposing of the nonjurisdictional issue regarding Charge III based upon this Court's recent decisions).  Beyond those matters, the case before us does not provide an appropriate vehicle for resolving the broader issues addressed in the majority opinion.

<u>United States v. Ali</u>, No. 12-0008/AR

   I. PROSECUTION OF DOD CIVILIANS AND DOD CONTRACTOR EMPLOYEES
        IN ARTICLE III COURTS AND IN COURTS-MARTIAL

     Over the past decade, American military forces have

conducted major combat operations in Iraq and Afghanistan.

During this period, DoD civilians and DoD contractor employees

have provided critical support to the armed forces.  Among those

civilian employees, a number have engaged in misconduct

sufficiently serious to result in prosecution for crimes

committed in the theater of operations.  The government has

prosecuted these cases under the Military Extraterritorial

Jurisdiction Act (MEJA), 18 U.S.C. §§ 3261-3267, and under

Article 2(a)(10), UCMJ.

<u>Prosecutions in the Article III courts</u>

     According to the Department of Justice:

          The Military Extraterritorial
     Jurisdiction Act [MEJA], 18 U.S.C. § 3261,
     <u>et seq</u>., is the principal Federal statute
     used to prosecute certain U.S. Government
     employees, contractors, and their dependents
     who commit crimes overseas. . . .

          Since MEJA was enacted, the Justice
     Department has successfully prosecuted
     numerous MEJA cases involving former
     Department of Defense employees or
     individuals accompanying them overseas.

<u>Holding Criminals Accountable:  Extending Criminal Jurisdiction</u>

<u>to Government Contractors and Employees Abroad:  Hearing Before</u>

<u>the S. Comm. on the Judiciary</u>, 112th Cong. 2 (2011) (statement

of Lanny A. Breuer, Assistant Attorney General), <u>available at</u>

http://www.judiciary.senate.gov/pdf/11-5-25%20Breuer%20Testimony.pdf.

As an example of a successful prosecution under MEJA, the Department of Justice cited United States v. Brehm, No. 1:11-cr-11, 2011 U.S. Dist. LEXIS 33903, 2011 WL 1226088 (E.D. Va. Mar. 30, 2011), appeal docketed, No. 11-4755 (4th Cir. Jul. 29, 2011). Brehm bears many similarities to the appeal now before us -- a foreign national employed by a DoD contractor who stabbed another foreign national and was apprehended by American military personnel. In Brehm, the incident led to federal civilian charges, trial in the Eastern District of Virginia, conviction, and sentence to forty-two months of confinement.

Prosecution in courts-martial

Since 2006, Article 2(a)(10), UCMJ, has provided statutory authority for the prosecution of civilians accompanying the armed forces in the field during contingency operations. Although the armed forces and military contractors have employed a large number of civilians in Iraq and Afghanistan during that period, the UCMJ has not been a significant factor in the prosecution of misconduct by civilians. In contrast to the prosecution of numerous civilians under MEJA, the parties in the present case have identified only one civilian convicted under the UCMJ during the conflicts in Iraq and Afghanistan -- Appellant, a host-country national. The charges against Ali,

like the charges against Brehm, grew out of an assault with a knife on another foreign national. Ali received a court-martial sentence of confinement for five months, reduced to 115 days as a result of a plea agreement. Unlike Brehm, who received a much longer sentence at his trial in the Eastern District of Virginia, Ali was not subject to Article III jurisdiction under MEJA. See 18 U.S.C. §§ 3267(1)(C), 3267(2)(C) (excluding host-country nationals from coverage under MEJA).

## II. UCMJ JURISDICTION OVER APPELLANT

The minimal use of UCMJ jurisdiction over civilians does not diminish the importance of the case to the parties before us, but it suggests caution as to the range of issues that should be resolved in this case. The appeal before us involves a narrow record focusing on a unique statutory niche occupied by this Appellant, a host-country national whose conduct in the theater of operations was excluded from Article III coverage under MEJA.

Part II.C. of the majority opinion upholds the constitutionality of UCMJ jurisdiction over Appellant. __ M.J. at __ (33-35) (observing that in the absence of Article III coverage of Appellant's conduct under MEJA, court-martial jurisdiction may be sustained under the Constitution because the UCMJ provides the "least possible power adequate to the end proposed" under the circumstances of the case) (citing Toth v.

4

Quarles, 350 U.S. 11, 23 (1955)).  I agree with that portion of the opinion.  Although the legislative history of the MEJA exclusion for host-country nationals is not extensive, it reflects congressional sensitivity to the interests of a host country in prosecuting its own citizens, an appropriate consideration under the military and foreign affairs powers of Congress.  See H.R. Rep. No. 106-778, pt. 1, at 21 (2000); see also Report of the Advisory Committee on Criminal Law Jurisdiction Over Civilians Accompanying the Armed Forces in Time of Armed Conflict, at 61 (Apr. 18, 1997) (reflecting concern about "unnecessary conflicts of jurisdiction and other difficulties" that could arise if Article III jurisdiction under the proposed statute covered host-country nationals).  I also agree with the majority's decision to not address the constitutionality of UCMJ jurisdiction over other civilians.

### III. JURISDICTION IN CIRCUMSTANCES NOT AT ISSUE IN THE PRESENT APPEAL

The open question

The portion of the majority opinion that discusses the rights of foreign nationals is not necessary to the disposition of the present case.  The case before us involves the very narrow question of court-martial jurisdiction over a host-country national excluded from Article III coverage under MEJA. A very different constitutional question -- an open question --

5

would arise under the "least possible power adequate to the end proposed" test if the conduct at issue involved a DoD civilian or DoD contractor employee who, as third-county national, would be subject to Article III coverage under MEJA.

The constitutional importance of considering the availability of Article III coverage has been underscored by the government's recent appellate filing in Brehm, a MEJA case involving a third-country national:  "By authorizing the trial of civilians in an Article III court, MEJA bestows on such persons all of the constitutional guarantees accorded by Article III and the Bill of Rights, and thus does not implicate the concerns about depriving civilians of those protections when they are tried by court-martial."  Brief for Plaintiff-Appellee at 38 n.11, United States v. Brehm, No. 11-4755 (4th Cir. Feb. 14, 2012).  In Brehm, the government's filing addressed the issue of court-martial jurisdiction over civilians under Article 2(a)(10), UCMJ, in the context of current contingency operations, candidly acknowledging that the constitutionality of the UCMJ provision presents an "open question."  Id. at 15 n.5.

In the present appeal, we do not have an adequate basis in either the trial record or appellate filings to address the "open question" of whether, or in what circumstances, UMCJ jurisdiction can be extended over third-country nationals for conduct that is subject to Article III coverage.  In that

context, it is appropriate to limit our decision to the statutory category now before us -- a host-country national whose conduct is excluded from Article III coverage under MEJA.

The present case does not require us to address Johnson v. Eisentrager, 339 U.S. 763 (1950), and its progeny. Eisentrager did not involve conduct subject to trial in an Article III court. In Eisentrager, the Supreme Court emphasized that the case involved the conviction of an enemy alien by an overseas military commission in circumstances where no Article III court was available. See id. at 765, 777-78, 781. Consideration of whether Eisentrager applies to persons subject to Article III coverage under a statute such as MEJA should be reserved for a case in which the affected person has an opportunity to fully litigate that issue at trial and on appeal.

Structural considerations in the context of Article III coverage

The issue of jurisdiction involves a broader set of constitutional values than the personal exercise of Fifth and Sixth Amendment rights. The Supreme Court, in its consideration of UCMJ jurisdiction over civilians, focused significant attention on constitutional structure, including the separation of powers, the role of Article III as the foundation for criminal trials, and the function of trial by jury as a limitation on governmental power. See, e.g., Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 237-38, 246-47 (1960);

United States v. Ali, No. 12-0008/AR

Reid v. Covert, 354 U.S. 1, 10, 22, 36, 38-39 (1957); Toth v. Quarles, 350 U.S. at 17-18; see generally Grisham v. Hagan, 361 U.S. 278 (1960); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281 (1960).

The Supreme Court, in its comparison of courts-martial to Article III courts, took note of the reforms contained in the Uniform Code of Military Justice, as well as the honor and professionalism of military personnel, but concluded that courts-martial are constitutionally distinct from Article III courts from a separation of powers perspective. See, e.g., Covert, 354 U.S. at 36-38; Toth, 350 U.S. at 17-18. In its separation of powers analysis, the Court focused on the fact that the critical decisions of guilt and innocence in a court-martial are made by "ad hoc bodies appointed by a military officer from among his subordinates" who "do not and cannot have the independence of jurors drawn from the general public." Covert, 354 U.S. at 36. The Court also focused on the absence of judges with the degree of independence provided by the tenure provisions of Article III. See id. at 36-37; Toth, 350 U.S. at 17-18.

Although the military justice system has continued to evolve since the Supreme Court's decisions in the Toth-Guagliardo line of cases, the differences between courts-martial and Article III courts remain fundamentally unchanged with

8

respect to the separation of powers.  The division of responsibilities for criminal trials in the Article III courts embodies the classic constitutional allocation of powers among legislative, executive, and judicial functions.  The organization of courts-martial, by contrast, reflects a long tradition of concentrating power in the Executive Branch.  As in the past, today's military justice system does not permit trial by jury, does not provide constitutional or statutory tenure protections for the judiciary, contains features that combine prosecutorial and judicial functions, and reflects the significant exercise of legislative functions by executive officials.  See, e.g., Articles 25, 26, 36, 56, 60, 92, UCMJ, 10 U.S.C. §§ 825, 826, 836, 856, 860, 892 (2006).  The military justice system exists as an instrument of command, designed to promote the good order and discipline essential to the conduct of military affairs.

The import of the differences between courts-martial and Article III courts primarily concerns constitutional structure, not due process.  See Singleton, 361 U.S. at 246.  The issue of jurisdiction addresses the preference for trial by jury as a matter of constitutional choice, not fundamental fairness.  The military justice system, on a daily basis, demonstrates that a person can receive a hearing and appellate review consistent with fundamental notions of fairness.  See Weiss v. United

States, 510 U.S. 163, 176-81 (1994).  In a trial by court-martial, the accused enjoys many of the same rights as a defendant in an Article III trial, and in some areas, the accused before a court-martial has greater rights than a defendant in an Article III proceeding.  See, e.g., Homer E. Moyer Jr., Procedural Rights of the Military Accused: Advantages Over a Civilian Defendant, 22 Me. L. Rev. 105 (1970).

The constitutionality of a criminal trial, however, involves more than adherence to general notions of fairness. The Constitution, as a source of authority and a limitation on power, mandates the conduct of criminal trials in a particular manner.  See Toth, 350 U.S. at 18.  Cf. Crawford v. Washington, 541 U.S. 36, 61-63 (2004).

In the military justice system, Congress has established a criminal trial forum that does not comport with the structure mandated by Article III of the Constitution.  Judicial review of legislation that subjects civilians to trial by courts-martial requires an assessment of whether the statute at issue, on its face and as applied, fits within the narrow range of constitutional exceptions to the requirements of Article III. See, e.g., Guagliardo, 361 U.S. at 284-86; Covert, 354 U.S. at 30-34.  Such an assessment requires consideration of whether the exercise of jurisdiction under the legislation involves the "least possible power adequate to the end proposed."  Toth, 350

U.S. at 23.  See Guagliardo, 361 U.S. at 286.  Cf. United States v. Solorio, 483 U.S. 435, 440 n.3 (1987) (noting that the "least possible power" test is confined to the context in which it arose -- a court-martial of a civilian).

The Supreme Court observed in Covert that the exercise of court-martial jurisdiction over civilians raises constitutional issues of the "utmost concern."  354 U.S. at 3.  The present case does not provide an appropriate vehicle for addressing the full range of those important issues.

Application of the standard developed in the Toth-Guagliardo line of cases calls for a carefully developed trial and appellate record sensitive to the statutory text and operational context of the MEJA-UCMJ relationship in a specific set of factual circumstances.  The constitutionality of UCMJ jurisdiction over civilians other than host-country nationals is an open question, and should remain so until properly developed and briefed in a case involving parties having a direct interest in the scope of such a decision.