# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI,[1] SIMS, and GALLAGHER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Civilian ALAA MOHAMMAD ALI**
**United States Army, Appellant**

ARMY 20080559

Multi-National Corps—Iraq
Timothy Grammel, Military Judge
Colonel Thomas E. Ayres, Staff Judge Advocate

For Appellant:  Captain Tiffany K. Dewell, JA (argued); Colonel Mark Tellitocci, JA; Lieutenant Colonel Imogene M. Jamison, JA; Lieutenant Colonel Jonathan F. Potter, JA; Lieutenant Colonel Peter Kageleiry, Jr., JA; Captain Tiffany K. Dewell, JA (on brief).

For Appellee:  Major Adam S. Kazin, JA (argued); Colonel Michael E. Mulligan, JA; Major Amber J. Williams, JA; Major Adam S. Kazin, JA (on brief).

18 July 2011

------------------------------------
OPINION OF THE COURT
------------------------------------

SIMS, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of making a false official statement, wrongful appropriation, and wrongfully endeavoring to impede an investigation, in violation of Articles 107, 121, and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 907, 921, and 934 [hereinafter UCMJ].  The military judge sentenced appellant to five months of confinement.  Pursuant to a pretrial agreement, the convening authority approved only so much confinement as appellant had served in pretrial confinement.[2]

---

[1] Senior Judge TOZZI took final action in this case prior to his permanent change of duty station.

[2] The convening authority action contained the following language:  "The sentence is approved and shall be executed in accordance with the pretrial agreement; sentence

(continued . . .)

## PROCEDURAL BACKGROUND

On 22 June 2008, after contesting military jurisdiction, appellant pleaded guilty to three charges in Baghdad, Iraq.  After trial, but prior to the convening authority taking action, appellant filed a petition for extraordinary relief with this court, seeking a writ of prohibition on the grounds that his court-martial lacked jurisdiction.  Following the denial of his petition by this court, appellant filed a writ-appeal petition with the United States Court of Appeals for the Armed Forces (C.A.A.F.).  On the same day that the C.A.A.F. denied appellant's writ petition, the convening authority approved the findings and sentence.  Thereafter, appellant's record of trial was forwarded to The Judge Advocate General (TJAG) of the Army for review under Article 69(a), UCMJ.

On 31 March 2010, TJAG forwarded appellant's case to this court pursuant to Article 69(d), UCMJ for review in accordance with Article 66, UCMJ and requested that attention be given to the following issues:

> **A.  WHETHER THE COURT-MARTIAL HAD JURISDICTION OVER THE ACCUSED PURSUANT TO ARTICLE 2(A)(10), UNIFORM CODE OF MILITARY JUSTICE;**
>
> **B.  WHETHER THE COURT-MARTIAL HAD SUBJECT[-]MATTER JURISDICTION OVER THE OFFENSES.**

When given the opportunity to submit a brief, appellant raised the following assignment of error:

> **WHETHER THE MILITARY JUDGE ERRED IN RULING THAT THE COURT HAD JURISDICTION TO TRY APPELLANT AND THEREBY VIOLATED THE DUE PROCESS CLAUSE OF THE FIFTH AND SIXTH AMENDMENTS BY REFUSING TO DISMISS THE CHARGES AND SPECIFICATIONS.**

---

(continued . . .)
is for time served in pretrial confinement."  Although the action is not in proper form and fails to state the number of days of credit to be awarded to appellant against his sentence of confinement, it is clear to us that the convening authority intended to approve only 115 days of confinement and to credit appellant with an equal number of days of pretrial confinement to account for the "time served" by appellant as of the date of his trial.  We will correct these errors in our decretal paragraph.

**FACTS**

In 2000, the United States enacted the Military Extraterritorial Jurisdiction Act (MEJA), which created United States federal criminal jurisdiction over persons "employed by the Armed Forces outside the United States."  18 U.S.C. § 3261(a)(1). The MEJA definition of persons "employed by the Armed Forces outside the United States" includes contractors and subcontractors, but not nationals of the host nation in which they are employed.  18 U.S.C. § 3267(1)(a) and (c).

In 2006, Congress amended Article 2(a)(10), UCMJ, which had long authorized UCMJ jurisdiction over "persons serving with or accompanying an armed force in the field" during "time of war." This amendment was effected by replacing the temporal requirement of a "time of war" with "time of declared war or contingency operation."[3]

In January of 2008, appellant, who is an Iraqi-born naturalized citizen of both Canada and Iraq, returned to Iraq from Canada as an employee of the L3 Communications/Titan Corporation (L3/Titan), which was under contract to provide interpreters for the U.S. military in Iraq.[4]  Prior to his deployment to Iraq, appellant travelled from Canada to the Continental United States Replacement Center at Fort Benning, Georgia, where he was issued military equipment and provided pre-deployment training.  Although no sign-in sheets exist to prove that appellant attended a specific training session in which the applicability of the UCMJ to civilian contractors in Iraq was discussed, there is strong circumstantial evidence that he was present when one of the instructors told the group that contractors were subject to prosecution under the UCMJ, but that the instructor personally did not think that contractors would be prosecuted by the military.

Once in Iraq, appellant was sent to a Combat Outpost (COP) and tasked with providing linguistic support to a squad within the 170th Military Police Company as that unit provided training and advice to Iraqi police units engaged in counter-insurgency operations in and around Hit, Iraq.  Although his contract with L3/Titan

---

[3] Prior to appellant's trial, the Secretary of Defense issued guidance in regard to the implementation of the jurisdictional change.  Memorandum from the Sec'y of Def., to Sec'ys of the Military Dep'ts, Chairman of the Joint Chiefs of Staff, Under Sec'ys of Def., Commanders of the Combatant Commands, Subject:  UCMJ Jurisdiction Over DoD Civilian Employees, DoD Contractor Personnel, and Other Persons Serving With or Accompanying the Armed Forces Overseas During Declared War and in Contingency Operations (10 Mar. 2008).

[4] Because MEJA specifically exempts citizens of the host nation from federal criminal jurisdiction, it is unlikely that appellant could have been subject to prosecution under that statute due to his status as an Iraqi citizen.

clearly indicated he would be working in a combat zone, it did not address the applicability of the UCMJ to appellant in that combat zone.

During his deployment, appellant was equipped and dressed similarly to the soldiers he was supporting in that he wore a Kevlar helmet, Interceptor Body Armor, the Army Combat Uniform, and ballistic eyewear. He wore the soldiers' distinctive unit patch and was housed on the COP with other interpreters and the soldiers they supported. Unlike the soldiers he was supporting, however, appellant did not carry a weapon and had the right to refuse to participate in a mission.

Although he was "imbedded" with the unit and generally followed the day-to-day instructions of the unit squad leader, Staff Sergeant (SSG) Butler, his direct supervisor was the L3/Titan site manager, who was located at Al Asad, Iraq. Whenever the squad to which he was attached went out on missions, appellant accompanied that squad and worked alongside the soldiers. As the squad interpreter, he performed a mission-critical function, serving as the direct link between the soldiers and Iraqi police officers being trained. Without his assistance, the squad would not have been able to perform its primary mission. Because enemy insurgents recognized the mission-critical nature of the work of the interpreters, the enemy routinely targeted interpreters in Iraq and had killed more than 300 of them as of the time of appellant's trial.

On 23 February 2008, appellant was involved in a verbal dispute with another interpreter, Mr. Al-U., which turned into a physical altercation resulting in appellant being struck in the back of his head. Appellant promptly reported the assault to a noncommissioned officer who escorted appellant to SSG Butler's room. After receiving the report of the assault, SSG Butler departed the room to go look for Mr. Al-U. Appellant seized this opportunity to take a knife from SSG Butler's military gear, ostensibly for self-defense, and returned to the common room of the building on the COP in which appellant resided. Not long thereafter, Mr. Al-U. entered the common room and initiated another altercation which resulted in appellant using SSG Butler's knife to cut Mr. Al-U. Following the altercation, appellant fled the immediate area, went to the latrines, and hid the knife under the floor boards to prevent the knife from being found by military police. Because there were eyewitnesses to the second altercation, appellant soon admitted to "cutting" Mr. Al-U. After initially claiming to have used a piece of wood, appellant admitted to having used a knife, which he then falsely claimed to have purchased in Canada and brought with him to Iraq.

When L3/Titan officials were informed of the incident, they arranged for appellant to be transferred to the Victory Base Complex (VBC) and to begin supporting a different military unit at that location. On 26 February 2008, the VBC garrison commander restricted appellant to the limits of the VBC. After being restricted, appellant made his way to Al Asad Air Terminal and attempted to depart

Iraq. Appellant was apprehended and returned to the VBC, where the garrison commander ordered him into pretrial confinement on the VBC on 29 February 2008. Because appellant could no longer perform his contractual duties while in confinement, L3/Titan terminated his employment on 9 April 2008.

Appellant was originally charged with one specification of aggravated assault with a dangerous weapon. Prior to trial, appellant raised numerous motions to include a motion to dismiss for lack of jurisdiction. After hearing evidence, the military judge denied the jurisdiction motion. On 17 June 2008, appellant was charged with three additional charges related to his actions immediately following the assault. Thereafter, appellant negotiated a pretrial agreement in which the convening authority agreed to dismiss the assault charge and limit confinement to time served if the accused agreed to plead guilty to the three additional charges.

## DISCUSSION

Before this court, appellant contends that his court-martial lacked jurisdiction because Congress exceeded the scope of its legislative authority when it amended the UCMJ to extend court-martial jurisdiction to reach civilians during contingency operations and thereby deprived him of the due process protections of the Fifth and Sixth Amendments to the United States Constitution.[5] Appellant argues that a long line of Supreme Court precedent disfavors the exercise of military jurisdiction over civilians and that therefore this court should set aside the findings and sentence in his case.

### A. Statutory Analysis

Before addressing appellant's constitutional arguments, we will first evaluate whether appellant and his conduct fit within the statutory jurisdictional framework of the UCMJ. If we find that neither appellant nor his offenses fall within the meaning of the applicable statutory provisions, we need not address his constitutional claims in order to resolve this case.

For court-martial jurisdiction to vest, in all cases there must be jurisdiction over both the offense and the accused. *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006). The issue of jurisdiction is a legal question that this court reviews de novo. *Id.*

In order for there to be court-martial jurisdiction under Article 2(a)(10), UCMJ, three conditions must be met:

---

[5] Specifically, appellant alleges that he was denied the right to have a jury of his peers, to have that jury consist of more than five members, and to require that jury to reach a unanimous verdict.

1. The offense and trial must occur during either a time of declared war or "a contingency operation;"
2. The person must be "serving with or accompanying an armed force;" and
3. The person must be "in the field."

Because the United States has not been in a state of declared war since World War II, we first must determine whether or not a "contingency operation" existed during the time of the offenses and at the time of trial. In the case at hand, both the offenses and the court-martial occurred during Operation Iraqi Freedom, a military operation that falls squarely within the statutory definition of "contingency operation" as found at 10 U.S.C. § 101(a)(13).[6] Operation Iraqi Freedom is a Secretary of Defense-designated military operation, taking place during a presidentially declared national emergency and which resulted in the call or order to active duty of members of reserve components.[7]

Next, we must determine if appellant was "serving with or accompanying an armed force." The test for making that determination is whether he has "moved with a military operation and whether his presence with the armed force was not merely incidental, but directly connected with, or dependent upon, the activities of the armed force or its personnel." *United States v. Burney*, 6 U.S.C.M.A. 776, 788, 21 C.M.R. 98, 110 (1956). In this case, it is undisputed appellant "moved with a military operation" as he was transported into the theater of operations via military aircraft and was transported by soldiers via military vehicles throughout Iraq as he performed his duties. His presence in Iraq was "not merely incidental" to that of the

---

[6] The term "contingency operation" means a military operation that

(A) is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or

(B) results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12305, or 12406 of this title, chapter 15 of this title, or any other provision of law during a war or during a national emergency declared by the President or Congress.

[7] Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sep. 14, 2001) (Declaration of National Emergency by Reason of Certain Terrorist Attacks); Exec. Order No. 13,223, 66 Fed. Reg. 48,201 (Sep. 14, 2001) (Ordering the Ready Reserve of the Armed Forces to Active Duty and Delegating Certain Authorities to the Secretary of Defense and the Secretary of Transportation); Presidential Notice, 72 Fed. Reg. 52,465 (Sept. 12, 2007) (Continuation of the National Emergency With Respect to Certain Terrorist Attacks).

armed force. Instead, his presence was "directly connected with" and "dependent upon" the activities of the soldiers in the squad to which he was attached. Appellant lived on a combat outpost with them and depended on them for protection and logistical support. He routinely served side-by-side with them as they performed their daily military missions in support of Operation Iraqi Freedom. In fact, as noted by the military judge, appellant was "critical to the mission" in that the squad could not accomplish its mission without him.[8] In short, his presence as an interpreter was essential to the ability of the unit to accomplish its primary mission of training and advising the Iraqi police. Following the altercation with another interpreter on the combat outpost, he continued to accompany the armed force, albeit involuntarily, when he was reassigned to work at the VBC, placed in pretrial confinement on the VBC, and tried on the VBC. Under the totality of the facts of this case, we have no doubt that appellant was "serving with or accompanying an armed force" both at the time of the offenses and at the time of his court-martial.

Lastly, we examine whether appellant was "in the field." At all times relevant to our inquiry, Iraq was specifically designated as a combat zone in which soldiers were authorized hazardous duty pay.[9] Further, all of the offenses in question occurred on a combat outpost in an "area of actual fighting" against enemy insurgent groups. Throughout his deployment, appellant and the troops he supported were under a constant threat of attack by small arms fire, indirect fire, improvised explosive devices, and vehicle-borne explosive devices. Because of his critical role as an interpreter, he was subject to being personally targeted by the enemy. Even after appellant was moved to the VBC for his reassignment, pretrial confinement, and trial, he resided on a military base in central Iraq that was subject to attack by enemy forces.

After a careful consideration of all the salient facts of this case, we have no doubt both appellant and his offenses fall squarely within the jurisdictional language of Article 2(a)(10), UCMJ, as amended. Accordingly, unless Article 2(a)(10), UCMJ, as applied to appellant, is violative of the United States Constitution, military jurisdiction was properly vested in appellant's case.

---

[8] Appellate Exhibit LI.

[9] Exec. Order No. 12,744, 56 Fed. Reg. 2663 (Jan. 21, 1991) (Designation of Arabian Peninsula Areas, Airspace, and Adjacent Waters as a Combat Zone) (listing Iraq as an area in which Armed Forces of the United States are and have been engaged in combat).

## B. Constitutional Analysis

We must, therefore, examine Article 2(a)(10), UCMJ in light of existing legal and historical precedent to determine whether its application to appellant runs afoul of the Constitution.

The United States Constitution authorizes Congress to "make Rules for the Government and Regulation of the land and naval Forces." Article I, Section 8, Clause 14. Clause 18 of that Article further authorizes Congress to "make all Laws which shall be necessary and proper" to execute the powers vested in the Congress. Article I, Section 8, Clause 18. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 237 (1960); *Reid v. Covert*, 354 U.S. 1, 19 (1957); *Dynes v. Hoover*, 61 U.S. 65 (1857). These two provisions have long been held to constitute a limited authority for Congress to create exceptions, such as trial by courts-martial, to Article III courts. *Singleton*, 361 U.S. at 237. Because persons subject to trial by courts-martial are not afforded some of the Constitutional rights which are normally recognized in Article III courts, the Supreme Court has cautioned that the authority to convene a court-martial must be limited to "the least possible power adequate to the end proposed." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 23 (1955) (quoting *Anderson v. Dunn*, 19 U.S. 204 (1821)).[10]

Although the exercise of military jurisdiction over civilians accompanying military forces has long existed in America and actually predates the ratification of the Constitution, it has historically been applied in narrow circumstances in situations where the exercise of such jurisdiction was necessary for the military to maintain good order and discipline on the battlefield. Not surprisingly, the United States Supreme Court has invalidated numerous attempts by Congress and commanders to expand such jurisdiction to include times of peace.[11]

For example, the Supreme Court has twice invalidated the use of military courts to try civilians in times of martial law in geographical locations where there were no ongoing hostilities, the civil administration was not deposed, and the local

---

[10] Persons subject to trial by courts-martial are not afforded the right to a grand-jury indictment, required by the Fifth Amendment, or the right to a jury trial, required under the Sixth Amendment and Article III.

[11] The Supreme Court noted its agreement with the respected military scholar, Colonel William Winthrop, who wrote "a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace." *Covert*, 354 U.S. at 35 (citing to Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 107).

courts were open.[12] Between 1955 and 1960, the Supreme Court specifically prohibited the use of military courts to try former servicemen who committed offenses on active duty but who "had severed all relationship with the military" at time of trial,[13] to try civilian family members whose only military connection was the fact that they accompanied their service member spouses to overseas locations that were clearly not in a combat zone,[14] and to try civilian employees of the military who commit crimes overseas during times of peace.[15]

Although the instant case, like those previously decided by the Supreme Court, involves a civilian who was subjected to military jurisdiction, it is distinguishable in two very important respects: the appellant in this case committed all of his offenses and was court-martialed (1) during a time of actual hostilities and (2) in a location where actual hostilities were taking place. As noted in *Reid v. Covert*, "the extraordinary circumstances present in an area of actual fighting have been considered sufficient to permit punishment of some civilians in that area by military courts under military rules." *Covert*, 354 U.S. at 33. "In the face of an actively hostile enemy, military commanders necessarily have broad power over persons on the battlefront." *Id.* This recognition by the Supreme Court of the historical use of military courts to try civilians in areas of actual fighting, coupled with the recognition of the broad authority of military commanders on the battlefront would seem to authorize, or at least not prohibit, the exercise of military jurisdiction over appellant by the commander of the United States forces in Iraq.

During the Vietnam conflict, our superior court was faced with a civilian accused who, like appellant, committed his offenses during ongoing hostilities. In *United States v. Averette*, 19 U.S.C.M.A. 363, 41 C.M.R. 363 (1970), the Court of Military Appeals (the predecessor to the Court of Appeals for the Armed Forces) declined to address the constitutional issue and instead strictly interpreted a pre-2006 version of Article 2(a)(10), UCMJ as requiring a declaration of war as a condition precedent to the exercise of court-martial jurisdiction over a civilian contractor serving in Vietnam during that conflict. The majority decided to apply "a strict and literal construction of the phrase 'in time of war'" because to do otherwise "would open the possibility of civilian prosecutions by military courts whenever

---

[12] *Ex parte Milligan*, 71 U.S. 2 (1866) (prohibiting the military trial of civilians in Indiana during the Civil War); *Duncan v. Kahanamoku*, 327 U.S. 304 (1946) (prohibiting the military trial of civilians in World War II-era Hawaii).

[13] *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955)

[14] *Covert*, 354 U.S. 1 and *Singleton*, 361 U.S. 234.

[15] *Grisham v. Hagan*, 361 U.S. 278 (1960) and *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281 (1960).

military action on a varying scale of intensity occurs." *Averette*, 19 U.S.C.M.A. at 365, 41 C.M.R. at 365.[16] In reaching its holding in *Averette*, the Court of Military Appeals clearly was concerned that the phrase "in time of war" would be susceptible to a broad interpretation which could lead to the exercise of military jurisdiction over civilians in a wide variety of situations in which the military might be engaged in some sort of hostilities short of actual war.

Under the current version of Article 2(a)(10), UCMJ, however, there is no such danger of the broad application of the UCMJ to civilians because Congress has chosen to specifically limit the exercise of military jurisdiction over civilians by requiring either a formal declaration of war by Congress or the existence of a "contingency operation," as that term is narrowly defined by statute. 10 U.S.C. § 101(a)(13)(2000).

In addition to requiring either a declared war or the existence of a statutorily defined "contingency operation," Article 2(a)(10), UCMJ further limits the reach of military jurisdiction over civilians by requiring that the civilian be "serving with or accompanying an armed force" and that the civilian be "in the field." *See* discussion *supra* at part A. Statutory Analysis. These two requirements, when applied in conjunction with the temporal requirement that either a declared state of war or a contingency operation be in existence, ensure that the exercise of jurisdiction over civilians is "restricted" to the "narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Singleton*, 361 U.S. at 240 (citing *Toth*, 355 U.S. at 22).

In reaching our decision on the constitutionality of Article 2(a)(10), UCMJ, we are mindful of the words of Judge Latimer in *Burney*, wherein he noted that "all grants of jurisdiction to military courts found in the [UCMJ] must be enforced . . . unless we are convinced that they are fundamentally hostile to military due process, or that they have been specifically condemned by the Supreme Court." *Burney*, 6 U.S.C.M.A. at 782, 21 C.M.R. at 104-05. In this case, we can discern no manner in which the exercise of military jurisdiction over a non-U.S. citizen who knowingly accepted employment supporting U.S. forces in a combat zone during a declared contingency operation would be fundamentally hostile to either military or civilian due process, nor have we found any Supreme Court precedent that specifically precludes the exercise of such jurisdiction.

---

[16] We note that the government was precluded from appealing the decision of the Court of Military Appeals in *Averette* because there was no provision in the law prior to 1983 that would have authorized such an appeal. *See* 28 U.S.C. § 1259, which authorized both the government and an accused to petition the United States Supreme Court for a writ of certiorari under certain circumstances following a decision of the Court of Military Appeals.

ALI – ARMY 20080559

Accordingly, we find that appellant's court-martial had both personal and subject matter jurisdiction over the appellant. In light of our holding, it follows that the military judge did not err in ruling that the court had jurisdiction over appellant. Additionally, because we find that the exercise of military jurisdiction over appellant was proper, we find no violation of either the Fifth or Sixth Amendment of the United States Constitution by the military judge in his refusal to dismiss the charges and specifications facing appellant.

## CONCLUSION

The findings of guilty are affirmed. The court affirms only so much of the sentence as includes 115 days of confinement and orders that appellant be credited with 115 days of confinement credit to be applied against his sentence of confinement.[17]

Senior Judge TOZZI and Judge GALLAGHER concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[17] Our review of this case is limited by operation of Article 69(e), UCMJ, which states that Courts of Criminal Appeals "may take action only with respect to matters of law" in cases referred under Article 69(d), UCMJ. Accordingly, we did not conduct a review of the record for factual sufficiency. Instead, our decision is based solely upon a finding that the evidence presented was legally sufficient and that there were no errors at trial that materially prejudiced a substantial right of the appellant.

11