BAKER, Chief Judge
(concurring in part and in the result):
INTRODUCTION
I concur in the reasoning and the result with respect to Issue II.[1] I write separately regarding Issue I because, while I agree with the result, I believe the essential and threshold question in this case is whether Congress possesses the authority to amend the Uniform Code of Military Justice (UCMJ) to include within its jurisdiction civilian contractors serving with or accompanying the United States Armed Forces. Working forward from Article I of the United States Constitution, rather than backward from the Bill of Rights, Congress must have an enumerated and positive authority to act, even if its actions would not otherwise run afoul of the Bill of Rights. Thus, the military judge had it exactly right: “The two issues in this motion are whether the accused falls within the terms delineated by Congress in Article 2(a)(10), and, if so, whether Congress has the power under the United States Constitution to extend the jurisdiction of courts-martial to that extent.”
Only if one determines that Congress has an affirmative power to act, does one need to then consider whether it has done so in a manner consistent with the Bill of Rights and in particular the Fifth and Sixth Amendments. In this regard, the majority goes too far in concluding that the Amendments do not apply overseas to noncitizens: “Ultimately, we are unwilling to extend constitutional protections granted by the Fifth and Sixth Amendments to a noncitizen who is neither present within the sovereign territory of the United States nor established any substantial connections to the United States.” United States v. Ali, 71 M.J. 256, 268 (C.A.A.F. 2012). The Supreme Court offers a more nuanced approach stating that “questions of extraterritoriality [in the application of constitutional rights] turn on objective factors and practical concerns, not formalism.” Bowmediene v. Bush, 553 U.S. 723, 764, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008).
With respect to Appellant’s Fifth and Sixth Amendment arguments, in this case, the only question we need to reach expressly, or by implication, is whether the Government violated Appellant’s Fifth and Sixth Amendments in the manner in which it prosecuted him, as an Iraqi and Canadian national serving as a combat translator while embedded in a United States military unit in combat operations in Iraq. Appellant wore the same uniform as the other members in his squad, served as an interpreter on every mission the squad went on, and lived with and near other soldiers in his squad. Without Appellant his team could not perform its military mission. Thus, he was an integral member of this United States military unit.
In my view, if Appellant was sufficiently connected with the Armed Forces to qualify for UCMJ court-martial jurisdiction as a matter of statutory and constitutional law, then he was also sufficiently connected to the Armed Forces to be entitled to those rights embedded in the UCMJ to which members of the Armed Forces are entitled, including those rights and rules that are derived from the Fifth and Sixth Amendments. What he was not entitled to were rights extending beyond those provided to members of the Armed Forces as a matter of constitutional law.
*272 DISCUSSION
A. Congressional Authority to Act
The threshold question presented by Appellant is a structural one. Does Congress have authority to prescribe court-martial jurisdiction over certain contractors serving with or accompanying the United States Armed Forces? That is because “[t]he Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic.” United States v. Verdugo-Urquidez, 494 U.S. 259, 277, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Kennedy, J., concurring); see also Reid v. Covert, 354 U.S. 1, 6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion) (the United States “can only act in accordance with all the limitations imposed by the Constitution”); United States v. Comstock, — U.S. —, 130 S.Ct. 1949, 1956, 176 L.Ed.2d 878 (2010) (“[T]he Federal ‘[Gjovernment is acknowledged by all to be one of enumerated powers,’ which means that ‘[e]very law enacted by Congress must be based on one or more of those powers.”) (2d and 3d set of brackets in original) (citations omitted). If Congress does not have the power to legislate jurisdiction in this manner, then we need not reach the Bill of Rights issues. Moreover, the fact that an action does not violate Appellant’s Fifth or Sixth Amendment rights does not mean that the Congress has an enumerated or implied authority to take the predicate action in question.
The Government identifies Article I, Section 8, Clause 14, as its source of affirmative authority for Congress’s action. This clause states that “The Congress shall have Power ... [t]o make Rules for the Government and Regulation of the land and naval Forces.” Indeed, the Government rests its case upon this clause. Appellant, on the other hand, argues that his court-martial lacked jurisdiction because Congress exceeded its legislative authority when it amended the UCMJ to extend court-martial jurisdiction to reach civilians during contingency operations. Appellant relies on Supreme Court case law for the proposition that civilians may not be subject to military court-martial generally, but to the extent they can, it can only occur in the narrowest of circumstances necessitated by the lack of a civilian alternative. Therefore, he argues that this Court should reject the application of court-martial jurisdiction to him. See also Covert, 354 U.S. at 5, 77 S.Ct. 1222 (rejecting court-martial jurisdiction over American civilian dependants of servicemem-bers stationed at a United States Air Force base in England and a post in Japan); United States ex rel. Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (rejecting court-martial jurisdiction over civilian ex-ser-vicemember); Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866) (concluding that a citizen not connected with military service could not be tried by a military court when civilian courts are still operating).
Addressing the Government’s argument first, on the one hand, there is no question that Appellant was not a member of the land and naval forces at the time of his offense or at the time he was court-martialed. If he was, there would have been no reason to charge him under Article 2(a)(10), UCMJ, 10 U.S.C. § 802(a)(10) (2006), as a civilian contractor serving with or accompanying the Armed Forces. On the other hand, the Supreme Court has recognized that the authority under this clause may extend beyond those persons formally inducted into the United States Armed Forces. “[Tjhere might be circumstances where a person could be ‘in’ the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform.” Covert, 354 U.S. at 23, 77 S.Ct. 1222.
In my view, Appellant was certainly serving with and thus also accompanying the United States Armed Forces, but he was neither a member of the United States Armed Forces nor “in” the United States Armed Forces. If he were, then the Government should have charged him under Article 2(a)(1), UCMJ. Therefore, to the extent Congress’s authority is based on Article I, Section 8, Clause 14 (Rules and Regulations Clause) it must be derived from an authority that is either implied from this clause or is necessarily and properly derived from this clause on the theory that if Congress is to *273 govern and regulate the United States Armed Forces effectively, it must also be able to govern and regulate those who serve with and accompany the United States Armed Forces as well. This assertion, however, must be balanced against the Supreme Court’s continuing admonition that “the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction” with respect to civilians. Covert, 354 U.S. at 21, 77 S.Ct. 1222. This admonition includes courts-martial established pursuant to the UCMJ.
In the current legal context, I do not find sufficient positive authority to reach this result on the authority implied from Article I, Section 8, Clause 14 alone. Thus, if the Congress is to have authority to prescribe court-martial jurisdiction over civilian contractors serving with or accompanying the armed forces in the field, additional and complementary authority must be found somewhere in the Constitution outside of the Rules and Regulations Clause. In this case, the military trial judge and the United States Army Court of Criminal Appeals (CCA) relied upon Congress’s enumerated and implied war powers as well as its authority to make rules and regulations. United States v. Ali, 70 M.J. 514, 519-20 (A.Ct.Crim.App.2011). These powers are found, among other places, in Article I, Section 8, and include the power to: “lay and collect taxes ... to ... provide for the common Defense”; “define and punish ... [ojffenses against the Law of Nations”; declare war; make Rules concerning Captures on Land and Water; raise and support armies; provide and maintain a navy; and to provide for organizing, arming, and disciplining the military. U.S. Const. Art. I, § 8 els. 1, 10-13, 16. Congress also has the more general enumerated power of the purse and authority to pass such laws as are “necessary and proper” to effectuate its enumerated authorities. U.S. Const. Art. I, § 8, cl. 18. The Supreme Court has noted that the war powers provide “considerably more extensive” authority than Article I, Section 8, Clause 14 alone. United States v. Averette, 19 C.M.A. 363, 364, 41 C.M.R. 363, 364 (1970) (citing Covert, 354 U.S. at 33, 77 S.Ct. 1222).
While different courts, scholars, Congresses and Presidents will point to different clauses within this lexicon to describe and delimit Congress’s power, all will in some manner describe it as relating to the war powers. Most will also recognize that the war powers are in some manner both exclusive and shared with the President who serves as commander in chief and chief executive and exercises enumerated and implied powers over foreign affairs. U.S. Const, art. II, § 1, cl. 1, § 2 cls. 1-2; American Ins. Ass’n v. Garamendi, 539 U.S. 396, 414, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (“Although the source of the President’s power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the ‘executive Power’ vested in Article II of the Constitution has recognized the President’s ‘vast share of responsibility for the conduct of our foreign relations.’ ” (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring))). At the same time, as Justice Jackson noted in Youngstown, executive branch lawyers are loath to describe or define this power with specificity lest they in some manner limit its future and necessary use. See Youngstown, 343 U.S. at 641, 72 S.Ct. 863 (1952) (Jackson, J., concurring).
Courts are cautious as well. Id. at 635, 72 S.Ct. 863. This is based on considerations of deference and other considerations generally falling into the rubric of the political question doctrine. See Nixon v. United States, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (a controversy “involves a political question[ ] where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it” (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962))); see also Carr, 369 U.S. at 211, 82 S.Ct. 691 (emphasizing that resolution of foreign-relations issues “frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the *274 Government’s views”) (footnote omitted). For example, the Supreme Court, in discussing the nonjustieiability of a case involving military policy, emphasized that:
it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.
Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). One reason this Court was established was to provide a mechanism of civilian appellate review that had, or could develop, expertise in military justice. See Noyd v. Bond, 395 U.S. 683, 694, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969) (noting that Congress deliberately chose to confide appellate jurisdiction over courts-martial in a “specialized Court of Military Appeals, so that disinterested civilian judges could gain over time a fully developed understanding of the distinctive problems and legal traditions of the Armed Forces”).
Here, the Government’s assertion of jurisdiction is based in part on the war powers. Where that exercise results in the deprivation of individual liberty, some explanation is warranted beyond the majority’s single statement that “[t]he Supreme Court has cited Congress’s ‘war powers’ as the constitutional source of authority and justification for federal court decisions which ‘upheld military trial of civilians performing services for the armed forces’ ” in the context of World War I and World War II. Ali, 71 M.J. at 269-70 (quoting Covert, 354 U.S. at 33, 77 S.Ct. 1222). A number of principles are apparent.
First, court-martial jurisdiction over civilians is “a very limited and extraordinary jurisdiction” and “was intended to be only a narrow exception to the normal and preferred method of trial in [civilian] courts of law.” Covert, 354 U.S. at 21, 77 S.Ct. 1222. In Toth, the Supreme Court concluded that “the constitutional power of Congress to authorize trial by court-martial [over civilians] presents another instance calling for limitation to ‘the least possible power adequate to the end proposed.’ ” 350 U.S. at 23, 76 S.Ct. 1 (quoting Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 230-31, 5 L.Ed. 242 (1821)); see also McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 286, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960) (restating the Toth doctrine that Congress must use “the least possible power adequate to the end proposed” when defining court-martial jurisdiction over civilians (quoting Toth, 350 U.S. at 23, 76 S.Ct. 1)). While Congress amended Article 2(a)(10), UCMJ, to apply in either a contingency operation or declared war, “a strict and literal construction” of court-martial jurisdiction over civilians should be applied. Averette, 19 C.M.A. at 365, 41 C.M.R. at 365; see also William Winthrop, Military Law and Precedents 100 (2d ed., Government Printing Office 1920) (1895) (discussing that the predecessor of Article 2(a)(10), UCMJ, Article 63 of the Articles of War, in creating exceptional jurisdiction over civilians is to be “strictly construed”). This case involves a narrow application of Article 2(a)(10), UCMJ, to an Iraqi and Canadian national serving with and accompanying the United States Armed Forces on its missions during wartime in Iraq.
Second, at the same time, courts have long accepted and affirmed an appropriate exercise of court-martial jurisdiction over civilians. This jurisdiction is most appropriate in the context of armed conflict where it is not feasible or practicable to suspend military operations to pursue the transfer of persons back to the United States for trial. Thus, there have been a number of decisions by lower courts during the twentieth century upholding court-martial jurisdiction over civilians accompanying or serving with the armed forces “in the field.” See Perlstein v. United States, 151 F.2d 167 (3d Cir.1945); In re Berue, 54 F.Supp. 252 (S.D.Ohio 1944); In re Di Bartolo, 50 F.Supp. 929 (S.D.N.Y. 1943); McCune v. Kilpatrick, 53 F.Supp. 80 (E.D.Va.1943). The Supreme Court has not disturbed the legitimacy of these opinions. Moreover, the Court noted in Covert that “[t]o the extent that these cases can be justified, insofar as they involved trial of persons who were not ‘members’ of the armed forces, *275 they must rest on the Government’s ‘war powers.’” 354 U.S. at 33, 77 S.Ct. 1222.
Third, with respect to the application of Article 2(a)(10), UCMJ, to Appellant, there is no question that the context is one in which the war power is being exercised and that Appellant’s conduct fell within the ambit of that exercise of the war powers. Exercising its war powers, Congress specifically authorized the conflict in Iraq with the Authorization for Use of Military Force against Iraq Resolution of 2002. H.R.J. Res. 114, 107th Cong. (2002) (enacted). Appellant was serving as a combat linguist in Iraq pursuant to both Congress’s exercise of the war powers as well as the President’s. As the military judge noted, Appellant’s duties were crucial to the success of the United States mission. Appellant was “the direct link between the squad and the Iraqi Police officers being trained. Without an interpreter, the squad could not function and could not accomplish its mission.”
Fourth, a functional approach should be taken when determining the narrow and extraordinary limits of court-martial jurisdiction over civilians. In Boumediene, the Supreme Court discussed the extraterritorial application of the Constitution and demonstrated a clear focus not on formalism, but on what is practical.[2] 553 U.S. at 764, 128 S.Ct. 2229. The Court rejected a formalistic test of sovereignty and citizenship when determining the reach of the Constitution. While Appellant cites the Toth doctrine to argue that Congress did not use “the least possible power adequate to the end proposed,” and thus as long as civilian courts were open in the United States, Congress could not allow the military to exercise court-martial jurisdiction over civilians, Appellant ignores key facts. See Ex parte Milligan, 71 U.S. (4 Wall.) at 127.
By court-martialing Appellant, the Government sought to maintain discipline in the military and combat context as well as to provide for criminal justice. The war powers and the commander in chiefs authority surely include the power to discipline civilians serving with the United States Armed Forces in hostilities where it is “absolutely essential to maintain[ ] discipline among troops in active service,” or would be disruptive to combat operations. See Toth, 350 U.S. at 22, 76 S.Ct. 1 (noting that court-martial jurisdiction over civilians should be limited to the “narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service”); Ex parte Milligan, 71 U.S. (4 Wall.) at 126-27 (discussing necessity required to impose martial law). Appellant’s reading of Toth would require the military to ship host-country contractors home for even minor offenses. This also suggests that if Appellant had committed more serious offenses, Congress would not have had the authority to prosecute him either. This is also inconsistent with Boume-diene. Appellant “was enmeshed within a military unit both during duty time, when he was a required and integral part of accomplishing the military mission, and during off-duty time, when he lived in close proximity with and relied on the military unit to control the society within which he lived.” Indeed, the military judge found that the medical absence of the victim, who was also a combat translator, rendered his squad “mission incapable” for five days. If Congress could not extend court-martial jurisdiction to Appellant in this context the United States could not at one time hold Appellant responsible for his criminal offenses and provide for the military *276 discipline and readiness of a combat unit in the field.
Fifth, because the law does not prohibit the exercise of court-martial jurisdiction over civilians per se, or on its face, the scope of the exercise of authority here is limited by the as-applied nature of Appellant’s challenge. In this case, Appellant has received the same rights afforded to military service-members accused of violating the UCMJ, including the right to counsel and the right to appeal.[3] Therefore, we are not addressing a case of a civilian prosecuted in court-martial without recourse to appeal, including appeal before a civilian court, i.e., this Court. While jurisdiction could, in theory, be exercised under Article 2(a)(10), UCMJ, in the context of domestic security operations within the continental United States, we do not face that situation here.[4] Congress’s authority to define jurisdiction in the manner that it has is clearly strongest overseas in the case of active hostilities exemplified here.
Based on the foregoing analysis, the military judge and the CCA have it right. The real question in this case is whether the combination of the Rules and Regulations Clause, the war powers, and the Necessary and Proper Clause authorized Congress to legislate court-martial jurisdiction over this contractor, in this context. While Appellant was not a member of the United States Armed Forces, the war powers are implicated by the fact that Appellant was serving with and accompanying a military unit in combat and was an integral part of the unit and its mission. The state of hostilities, as authorized by Congress and the President, expands the exercise of Congress’s authority from one relying solely on the Rules and Regulations Clause to one that also rests upon the war powers by focusing on actual hostilities and the location where actual hostilities are taking place. As the military judge pointed out, “[a] deployed military unit without discipline is nothing more than an armed mob roaming a foreign country. Actual hostilities are a part of the environment in which the armed forces are conducting their military missions.” Therefore, the extension of court-martial jurisdiction to Appellant, under the particular facts of this case, is permissible pursuant to the Rules and Regulations Clause of the United States Constitution and the war powers.
B. Fifth and Sixth Amendments
Concluding that Congress does have the authority to prescribe jurisdiction in this manner, one must then ask whether it has done so in a constitutional manner. Appellant argues that the military violated his Fifth and Sixth Amendment rights when it exercised jurisdiction over him pursuant to Article 2(a)(10), UCMJ. Specifically, Appellant argues that the court-martial lacked three fundamental protections provided in Article III courts, an independent judge, grand jury indictment, and a jury trial.
The military judge at trial concluded that “the Sixth Amendment right to trial by jury does not apply to trials by courts-martial.” The military judge also concluded, “Because this is a ease arising in the land or naval forces, the Fifth Amendment explicitly states that the accused has no such right at his court-martial.” The CCA affirmed this position: “[Bjecause we find that the exercise of military jurisdiction over appellant was proper, we find no violation of either the Fifth or Sixth Amendment of the United States Constitution by the military judge.” United States v. Ali, 70 M.J. 514, 520 (A.Ct.Crim. App.2011). The majority affirms this position as well, but does so by relying on an expansive theory. It concludes that “constitutional protections granted by the Fifth and Sixth Amendments [do not extend] to a non-citizen who is neither present within the sovereign territory of the United States nor *277 established any substantial connections to the United States.” Ali, 71 M.J. at 270.
I conclude that Appellant’s Fifth and Sixth Amendment rights were not violated by his court-martial, but through a distinct and narrower analysis. As the military judge noted, the Constitution delimits the application of Fifth and Sixth Amendment to members of the United States Armed Forces. “No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; .... ” U.S. Const, amend. V. This exception to the requirement of indictment by grand jury “has been read over into the Sixth Amendment so that the requirements of jury trial are inapplicable.” Covert, 354 U.S. at 37 n. 68, 77 S.Ct. 1222 (citing Ex parte Quirin, 317 U.S. 1, 40, 63 S.Ct. 2, 87 L.Ed. 3 (1942)). The Supreme Court has upheld this limitation in the context of courts-martial. See, e.g., Ex parte Milligan, 71 U.S. (4 Wall.) at 123; Ex parte Quirin, 317 U.S. at 40, 63 S.Ct. 2. And, the Supreme Court and this Court have also recognized that constitutional rights may apply differently in the military context. United States v. Marcum, 60 M.J. 198, 205 (C.A.A.F.2004) (citing Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)).
It seems to me that if a civilian is sufficiently integrated into the United States Armed Forces to qualify for court-martial jurisdiction under Article 2(a)(10), UCMJ, then that same person is sufficiently integrated so as to be entitled to those Fifth and Sixth Amendment rights embedded in the UCMJ. Certainly this principle should apply in this narrow case where a foreign-national contractor served in the key role of a combat interpreter, was fully integrated into the military mission of his squad, lived with the squad, and wore the same clothing and equipment as members of the squad. What he was not entitled to were the rights to a jury trial and indictment by grand jury— rights that extend beyond those to which members of the United States Armed Forces are themselves entitled.
It is also a conclusion founded on the provision of rights rather than a declaratory preclusion of rights. Under the majority’s reasoning, Appellant essentially has no rights, other than those that the Executive and Congress have chosen to provide as a matter of discretion and grace through the operation of the UCMJ. Because the majority concludes that a noncitizen abroad has no Fifth or Sixth Amendment rights, this analysis would apply whether the court-martial was adjudicating a death penalty sentence or one for unauthorized absence.
To rule this conclusion, the majority relies on United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), a Fourth Amendment case, for the proposition that “a foreign national being tried outside the United States for a crime committed outside the United States[] enjoys” no protections under the Fifth or Sixth Amendments. Ali, 71 M.J. at 266. I would not rely on Verdugo-Urquidez to reach this result.
First, Verdugo-Urquidez is a Fourth Amendment case, and as the Court itself recognized, the Fourth Amendment is not the same as the Fifth Amendment.[5] 494 U.S. at 264, 110 S.Ct. 1056.
Second, reliance on the substantial connection test drawn from Verdugo-Urquidez seems particularly inapt in this case, because it creates something of a legal oxymoron. *278 On the one hand, Appellant has sufficient connection to the United States and the United States Armed Forces to be serving with or accompanying the United States Armed Forces for the purposes of establishing court-martial jurisdiction. But, on the other hand, his connection is not substantial enough to warrant application of the Fifth or Sixth Amendments. In my view, sendee with the Armed Forces of the United States in the uniform of the United States in sustained combat is a rather substantial connection to the United States.
Third, as noted in Part A, in Boumediene the Supreme Court noted that constitutional law overseas should not be applied in a formalistic manner, but in a practical and contextual manner. Johnson v. Eisentrager rejected the argument “that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses.” 339 U.S. 763, 783, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Verdugo-Urquidez stated that Eisentrager’s rejection of the Fifth Amendment was “emphatic.” 494 U.S. at 269, 110 S.Ct. 1056. However, the Court has pulled back from such broad strokes in recent years. For example, the Court in Boume-diene emphasized “that questions of extraterritoriality turn on objective factors and practical concerns, not formalism.” 553 U.S. at 764, 128 S.Ct. 2229. Thus, Boume-diene appears to significantly limit the blanket reach of both Verdugo-Urquidez and Eisentrager in favor of the more contextual and nuaneed view expressed above.
Fourth, and perhaps most importantly, the majority’s analysis would seem to apply in verbatim manner to noncitizens serving in the United States Armed Forces today to whom this Court routinely applies the rights guaranteed by the Fifth and Sixth Amendments, as evidenced by the fact that our cases have never asked whether the accused is a United States citizen. Noncitizens are eligible to serve as enlisted members of the United States Armed Forces, and, as of 2010, 16,500 noncitizens were serving in the military, making up about 1.4 percent of enlisted members. Office of the Under Secretary of Defense, Personnel and Readiness, Population Representation in the Military Services: Fiscal Year 2010 Summary Report at 39 (2011) (38th annual report). Between 1999 and 2008, around 70,000 noncitizens enlisted, making up four percent of non-prior service accessions into active-duty. Molly F. McIntosh et al., CNA, Non-Citizens in the Enlisted U.S. Military 5 (2011). To the extent there is a distinction based on citizenship, it would seem to depend on the distinction between serving as a fully integrated contractor while wearing the uniform and serving in the United States Armed Forces. There is a distinction, but in my view, it is a tenuous distinction, for both forms of service would appear to establish a substantial connection to the United States, at the very least in a descriptive manner.
I see it differently. Because Appellant was fully integrated into the United States Armed Forces, as described in Part A, and therefore subject to court-martial jurisdiction, he has those same rights as are provided to members of the military pursuant to the UCMJ, which after all is the same UCMJ pursuant to which he was being prosecuted. Some, but not all, of those rights are of course a reflection of and implementation of Fifth and Sixth Amendment principles. Thus, Appellant is not without the protections of the Fifth and Sixth Amendments because, when subject to court-martial jurisdiction, he is protected by at least some of these principles because they are embedded in the UCMJ and the Manual for Courts-Martial, United States. What constitutional rights he did not have, as servicemembers do not have, were the right to an indictment by grand jury and trial by civilian jury. For these reasons, I reach the same result but break in a decidedly different analytic direction than the majority.
In conclusion, as the military judge noted at trial, the question presented is whether Congress, in an exercise of its authority under Article I to make rules and regulations and pursuant to its war powers, can subject this foreign national, in this context, to court-martial jurisdiction and limit his rights to those provided under the UCMJ, a code that already applies to United States military per *279 sonnel. I conclude that Congress possesses the authority to amend the UCMJ to include within its jurisdiction civilian contractors serving with or accompanying the United States Armed Forces and that, in this case, the exercise of court-martial jurisdiction did not violate Appellant’s Fifth or Sixth Amendment rights.

. I concur in the result with regards to Issue III, but for reasons stated in my concurring opinion in United States v. Ballan, 71 M.J. 28, 36 (C.A.A.F.2012) (Baker, C.J., concurring in the result), and my dissenting opinion in United States v. Fosler, 70 M.J. 225, 240 (C.A.A.F.2011) (Baker, J., dissenting), I conclude that Appellant was on fair notice of the Article 134, UCMJ, 10 U.S.C. § 934 (2006), charge.

. It is worth noting that in Covert objective factors, including place of confinement and trial, unrelated to the petitioner’s citizenship were relevant to each of the justices constituting the majority. As the Court points out in Boumediene, 553 U.S. at 759, 128 S.Ct. 2229, Justice Black, writing for the plurality, contrasted the particular facts in Covert with previous cases concerning the extraterritorial application of the Constitution. 354 U.S. at 14, 77 S.Ct. 1222 (plurality). Justice Frankfurter, concurring, argued that “the specific circumstances of each particular case” are relevant in determining the geographic scope of the Constitution. Id. at 54, 77 S.Ct. 1222 (Frankfurter, J., concurring). Finally, Justice Harlan, concurring, rejected a “rigid and abstract rule” for determining the extension of constitutional guarantees. Id. at 70, 77 S.Ct. 1222 (Harlan, J., concurring). The Court in Boumediene emphasized that practical factors are serious considerations in determining the extraterritorial application of the Constitution. 553 U.S. at 755-64, 128 S.Ct. 2229.

. This latter right has been afforded to Appellant as a matter of executive discretion and grace, but that does not negate the fact that it was provided.

. Note that Operation Noble Eagle, Executive Order 13223, applied domestically (ordering reserves to active duty and delegating certain authority to the secretaries of the departments of Defense and Transportation to respond to threat of further attacks after September 11, 2001). Exec. Order No. 13223, 66 Fed.Reg. 48, 201 (Sept. 14, 2001).

. The Supreme Court stated:
Before analyzing the scope of the Fourth Amendment, we think it significant to note that it operates in a different manner than the Fifth Amendment, which is not at issue in this case
That text [of the Fourth Amendment], by contract with the Fifth and Sixth Amendments, extends its reach only to the "the people.”
The language [of the Fourth Amendment] contrasts with the words "person" and "accused" used in the Fifth and Sixth Amendments regulating procedure in criminal cases.
Verdugo-Urquidez, 494 U.S. at 264-66, 110 S.Ct. 1056.